RENDERED: MARCH 17, 2016
TO BE PUBLISHED

$\mathfrak{Supreme}$ $\mathfrak{Court}$ $\mathfrak{of}$ $\mathfrak{Kentucky}$ FINAL

2014-SC-000507-MR    DATE 4-7-16 EmA Grow. H. D.s

JASON DICKERSON                                                    APPELLANT


                ON APPEAL FROM FLOYD CIRCUIT COURT
V.              HONORABLE JOHNNY RAY HARRIS, JUDGE
                        NO. 14-CR-00070


COMMONWEALTH OF KENTUCKY                                           APPELLEE


                **OPINION OF THE COURT BY JUSTICE NOBLE**

                              **AFFIRMING**

    The Appellant, Jason Dickerson, was convicted of murder and four

counts of first-degree criminal abuse, and was sentenced to life in prison. On

appeal, he complains about the admission of evidence of his abuse of his

spouse, the admission of hearsay statements made to an examining

pediatrician and to an investigating detective, and several instances of alleged

prosecutorial misconduct during cross-examination of his expert witness and

in closing arguments. We affirm.

                            **I. Background**

    On September 29, 2011, two-year-old Watson Adkins died as a result of

severe physical trauma to his abdomen, among other parts of his body. The

parties dispute the nature of the injury or injuries that ultimately caused the

boy's death, but it is largely indisputable that he suffered severe physical abuse in the weeks or months leading up to his death.

The events leading to Watson's tragic death began earlier that year when he and his four siblings—Braxton (the oldest, then age 6),[1] Cameron, Alyssa, and Mary (the youngest, then an infant)—were temporarily removed from the custody of their mother, Rhoda Lewis, by the Cabinet for Health and Family Services due to poor living conditions in the home and Lewis's issues with substance abuse. Lewis cooperated and helped the Cabinet arrange for the children to be placed in the custody of her sister and brother-in-law, Gladys and Jason Dickerson,[2] in February 2011.

When the children first moved in with the couple, the Appellant was employed on a full time basis, and Gladys was their primary, day-to-day caregiver. But when Dickerson lost his job in April, Gladys obtained full-time employment with a nursing home, where she worked nightly shifts from 6:00 p.m. to 6:00 a.m. The children began attending day care, although Dickerson, who remained at home during the day, would keep some or all of them home on occasion.

On the morning that Watson died, Dickerson left their house in Prestonsburg and went with his parents to work on renovations to a trailer in Johnson County that the couple was planning to move into. Throughout the

---

[1] Braxton's father (the other four children have a different father) eventually took custody and removed him from the Dickersons' care in June 2011.

[2] For ease of reference, this opinion will typically refer to Gladys Dickerson by her first name and Jason Dickerson by his last name or as the Appellant.

course of the day, the three laid new tile in the kitchen and carpet in a living room, mounted a mirror in a bathroom, and repaired a sink and bathtub.

Shortly after 5:00 p.m., Gladys called 911 about Watson. During the lengthy call, she told the dispatcher that a big "white-headed boy" had attacked and hurt him the previous day while they were playing outside near the Johnson County trailer. Gladys can also be heard on the 911 recording purporting to attempt CPR on the child, stating she had heard "some whistling" and felt two heartbeats while doing so. It would eventually become clear that the child had already died before this call was made.

The statement Gladys initially gave to police essentially mirrored the two her husband would later give police. But her statement differed significantly from the testimony she later gave at his trial, which is summarized below. Notably, she initially rehashed the story about the "white-headed boy" to police, which she later admitted was made up (according to her, at her husband's insistence). She also stated that she had seen no significant bruises on the child prior to her administration of CPR while on the phone with the 911 dispatcher, with any bruising purportedly having been caused by her CPR attempts.

Jason Dickerson's first interview with police took place the same day. He, too, identified a "little white-headed boy" at the trailer park in Johnson County as the source of most of Watson's injuries, which he claimed included only small bruises on his knees and back. The child also had a cut on the back of his head that, Dickerson told police, he received by accidentally hitting his own

3

head on a towel rack.[3] He stated that the child had not complained of any pain before going to bed the previous night. He explained that he disciplined the children only with time-outs, no television, and smacks on the hand, and he told police that neither he nor Gladys ever hit the children. When advised that Watson's body had been severely bruised all over, he replied, "No child should have to go through that." He also told police that Lewis had been making two or three anonymous calls per day to social services about them.

A couple days later, police arrested Dickerson and interviewed him a second time. Continuing to deny any wrongdoing, he told police that Lewis had "mind control" over her children and had made the anonymous calls to social services because she wanted to make their life a "living hell." He claimed she did not want her children to remain in their care because she did not want them to be happy. Contrary to his first statement, he said Watson actually had complained about stomach pain the night before his death and that Gladys had given the child a stool softener in response; he also stated that Watson fell asleep after taking the stool softener. He stated his wife had told him that when she found the boy's body, she had administered CPR, performed the Heimlich maneuver, smacked his face, and felt his heart beat. He claimed she had thus been the cause of Watson's bruises and that they had "talked about that over and over and over." He reiterated his and Gladys's disciplinary techniques and

---

[3] Linda Sammons, the children's day care provider, testified that when she asked about the cut on Watson's head, Dickerson told her that he had hurt himself by hitting his head on the coffee table after he jumped and fell off the couch.

denied ever hitting them with a belt, even if that's what the children might have claimed to child-advocacy personnel.

The interviewing detective told Dickerson that he did not believe his story and that "the kids said you stomped that little kid, and they are covered in bruises." Dickerson responded, "I never stomped or hit them. I will admit that I have whipped them. I have never done anything to hurt one of them." He added, "I have whipped them, and Gladys has whipped them."

Police also followed-up on the story about the white-headed boy by interviewing neighbors who lived in the Johnson County trailer park and who had witnessed (and supervised) Watson and his siblings playing on the playground with other children. All those interviewed apparently refuted the story, or at least none could confirm that there was any truth to it. Four of the Johnson County neighbors interviewed by police testified at trial to this effect.

Both the Appellant and his wife were charged with Watson's murder and four counts of first-degree criminal abuse of Watson and the other children. (Unlike her four older siblings, the infant Mary was spared from any abuse.) They were tried separately, with Dickerson's trial being held first. Gladys testified against him at his trial, where she recanted her statements to police as being lies. She testified about Dickerson's physical abuse of the children and of Watson in particular (consistent with both Braxton's testimony and the medical evidence described below), and she explained that she had given false statements, and otherwise failed to report the child abuse, because she was scared of her husband, who physically abused her as well.

5

The evidence of Watson's and the other children's injuries—including autopsy reports, photographs, and medical examinations—was extensive. Dr. Cristin Rolf performed Watson's autopsy and testified at Dickerson's trial. According to Dr. Rolf, her autopsy of Watson revealed widespread, devastating internal and external injuries that were most notable and unusual in their location and severity. Dr. Melissa Currie, who is board-certified in child-abuse pediatrics, also provided expert testimony about Watson's injuries. Her findings were consistent with Dr. Rolf's testimony; and she testified without reservation that Watson's injuries and death were definitely caused by extreme, chronic physical abuse. Physical examinations of Cameron and Alyssa following Watson's death also showed evidence of extensive, widespread injuries consistent with physical abuse.

Perhaps the most compelling testimony came from Watson's oldest sibling, Braxton, who was ten years old at the time of trial. He testified about the abuse he and his siblings (and Gladys) endured before his father removed him from the Dickersons' care.

Braxton testified that the abuse began with Dickerson forcing the children to stand for extended periods of time, sometimes exceeding an hour, and that he would "throw the children in a corner" if they sat down or moved. He also testified that Dickerson would force the children to march around him with their hands in the air while he sat on the couch and that, either to mark the completion of laps or if he felt they were slowing down, he would strike them with the end of a "pool noodle" on which he had attached a hard object.

Braxton also testified that Dickerson would force the children to take long showers or baths in cold water that "felt like a swimming pool of ice." According to Braxton, he would closely monitor the children to make sure they "weren't turning the knob to warm or hot water," and he would "put his arm against [their] throats" and would hold the boys' heads underwater until they "ran out of breath" and Braxton "thought [he] was going to drown."

And he testified that Dickerson would force the boys to swallow dish-detergent and would not allow them to rinse. And at meals, according to Braxton, he would use his hands to shove food into their mouths and grab their throats and, immediately afterward, would punch them in their stomachs and cause them to vomit. Braxton testified that Dickerson would often strike them with his hands and feet and punch them in the stomach. And he physically demonstrated this for the jury in the courtroom and explained, "He would put his fist low, and then when we were on the ground, he would kick us while he grabbed something to hold onto. He would kick us until we were on our backs, and then he would stomp us."

Lewis, the children's mother, also testified at Dickerson's trial. According to her, she first suspected her children were being abused in March upon finding bruises on Watson's backside. She testified that thereafter she began noticing bruises on all her children (except the infant), with Watson reportedly exhibiting the worst of it. Although she took photographs of her children's injuries and reported her suspicions to social workers and the family court presiding over her case, her persistent complaining was to no avail. Instead, it

7

apparently eventually resulted in the family court finding that she was a destructive influence on her children and suspending her visitation rights.

One of the Dickersons' neighbors, Janet Owens, also testified to having been concerned about the children's treatment, specifically noting that there often appeared to be no adult supervision of them during the day. She, too, reported her concerns to social services on numerous occasions, and her complaints were no more successful than Lewis's. Owens also testified about seeing Dickerson shoving the children and roughly grabbing them by their shoulders on numerous occasions. And days before his death, she saw Dickerson outside with Watson spouting profanity while the boy cried and was bending over and "seemed hurt, like his stomach was hurting."

In his defense, Dickerson claimed he was innocent of Watson's death and sought to cast blame on his wife instead. To do so, he presented the testimony of forensic pathologist Dr. Charles Wetli, a retired former coroner from Florida who, since 2006, had worked solely as a testifying expert witness. According to Dr. Wetli, contrary to the opinions of the other medical experts in the case, Watson's death was caused by an acute trauma to the abdomen (rather than chronic trauma sustained over an extended period of time) inflicted between two and six hours before death. Dickerson (unsuccessfully, as it turned out) argued that this opinion, coupled with the irrefutable evidence that he was away from the children in Johnson County during the period of time in which Dr. Wetli said the fatal injury must have occurred, exonerated him of the child's death and proved Gladys was instead responsible. The Commonwealth

cross-examined Dr. Wetli extensively. It is unclear what, if any, defense Dickerson raised against the criminal-abuse charges.

Ultimately, the jury found Dickerson guilty of murder and all four counts of first-degree criminal abuse, and recommended consecutive prison sentences of life for the murder conviction and ten years for each abuse conviction. Partly adopting the jury's recommendation, the trial court sentenced Dickerson to life imprisonment, with the forty-year sentence for the abuse convictions to run concurrently.

Dickerson now appeals as a matter of right. *See* Ky. Const. § 110(2)(b). Additional facts will be developed as needed in the discussion below.

## II. Analysis

### A. Admission of other-bad-acts evidence was not error.

Dickerson first complains about the admission of evidence of his prior bad acts—namely, his history of domestic violence against his wife—arguing that it should have been excluded by KRE 404(b)'s prohibition against evidence of prior acts to prove action in conformity with those acts. The complained-about evidence involves the testimony of two witnesses: Gladys Dickerson and her sister, Crystal Howard. While his arguments with respect to Gladys's testimony are not entirely clear, Dickerson appears to generally claim that this evidence was not relevant for a proper "other purpose" to be admissible under KRE 404(b)(1) and that, in any event, the trial court failed to inquire into and weigh the probative value and prejudicial effect of the evidence as required by *Bell v. Commonwealth*, 875 S.W.2d 882, 889–91 (Ky. 1994). As to Howard's testimony—which was that their mother believed that Dickerson was abusing

9

Gladys—he argues that the trial court's admonition failed to cure the error and that he was entitled to a mistrial. We address each claim in turn.

### 1. The trial court did not abuse its discretion in allowing Gladys Dickerson to testify about being abused by her husband.

On appeal, we review KRE 404(b) admissibility decisions for an abuse of discretion. *Anderson v. Commonwealth*, 231 S.W.3d 117, 119 (Ky. 2007). A trial court abuses its discretion when its decision to admit or exclude evidence was "arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky. 1999).

Dickerson claims the trial court erred in allowing Gladys to testify about his physical abuse of her. Unfortunately, he failed to cite where the actual testimony forming the basis of this claim of error appeared in the record, as required by our rules. *See* CR 76.12(4)(c)(v) (requiring argument sections include "ample supportive references to the record"); RCr 12.02 (applying CR 76.12 to criminal appeals). Accordingly, "[w]e would be justified in disregarding this claim of error because counsel must sift through a record to show the reviewing court the basis for a claim for relief." *Mayo v. Commonwealth*, 322 S.W.3d 41, 54 (Ky. 2010). "It is well-settled that an appellate court will not sift through a voluminous record to try to ascertain facts when a party has failed to comply with its obligation under [our rules of procedure] ... to provide specific references to the record." *Parker v. Commonwealth*, 291 S.W.3d 647, 676 (Ky. 2009).

That said, the Commonwealth neither pointed out nor otherwise protested Dickerson's noncompliance with the briefing requirements and,

instead, responded to his claim on its face. We will do the same, but again caution appellate counsel to comply with all briefing requirements under CR 76.12 to guarantee a full review on appeal.

Moving to the substance of his claim, Dickerson argues that because he had not been charged with abusing Gladys, this evidence only served to demonstrate that he was a "bad and violent person to other people" to show action in conformity with that bad character to prove he was violent against the children, in violation of KRE 404(b).

Although KRE 404(b) prohibits admitting proof of other bad acts as propensity character evidence, KRE 404(b)(1) allows such evidence to be admitted if offered for some "other," non-character purpose—such as to show motive, opportunity, knowledge, absence of mistake, etc. For such evidence to be admissible, however, it must be relevant for at least one of these other purposes, and its probative value on that issue must exceed the prejudicial effect of its character-proving aspects. *Bell*, 875 S.W.2d at 889.

Here, Gladys's spousal-abuse testimony was offered for the relevant "other purpose" of showing that she was afraid of Dickerson. It was because of that fear, she claimed, that she had never reported his abuse of the children, had lied to social workers and others investigating the children's mother's reports of suspected abuse, and had given false exculpatory statements to emergency responders and law enforcement immediately following Watson's death.

Dickerson, however, argues that this offer of other-bad-acts evidence as such was nothing but improper "bolstering" of Gladys's trial testimony, which

11

under KRE 608, could only be introduced on rebuttal following an attack on the witness's truthfulness. This argument misses the mark, however, because Gladys's truthfulness was at issue in this case from the very beginning. That is, the truthfulness of her statements to police (and the related failures to report abuse) was put in issue as early as voir dire, when counsel introduced the defense theory of the case—namely, a sort of he-said-she-said situation where the "true culprit," Gladys, was merely pointing the finger at Dickerson to avoid punishment for her own criminal acts. The complained-about testimony, then, was rehabilitative proof that tended to rebut the direct and implied charges of fabrication leveled against Gladys from the outset as part of the defense's guilt-shifting trial strategy.

So, because the testimony was relevant for that purpose, it was admissible if its probative value in explaining why she lied to police and failed to report Dickerson's abuse of the children (because she was scared of him) outweighed the unfair prejudice arising from its tendency to prove Dickerson's violent-character. We agree with the trial court that it did.

The trial court acted well within its discretion in allowing Gladys's spousal-abuse testimony to be admitted, especially given the other evidence introduced in this case. For example, by the time Gladys testified, the jury had already heard testimony from Braxton about instances of Dickerson abusing her (along with the other children) during the period that he lived with the couple. And the jury had also heard testimony about past observations of Gladys's peculiar injuries and behaviors—e.g., bruises on her arms and neck and her habit of wearing turtlenecks and long sleeves, even in the heat of

12

summer—that, circumstantially at least, tended to show Dickerson physically abused his wife. Dickerson has not argued that this other testimony was erroneously admitted. And it influenced the probative-value-versus-prejudicial-effect analysis insofar as it was both corroborative (thereby increasing probative value) and cumulative (thereby decreasing prejudice) of the complained-about testimony.

Dickerson also argues that reversal is required because of the trial court's alleged failure to inquire whether Gladys's spousal-abuse testimony was sufficiently probative to allow for admission and whether its prejudicial effect nevertheless outweighed that probativeness to require exclusion. However, in a motion to exclude this testimony made immediately before Gladys took the stand at trial, defense counsel argued these exact points to the trial court in support of his request for exclusion. The video record of the in-chambers discussion makes clear that the trial court carefully considered his arguments and the Commonwealth's response before overruling the motion. Thus, the argument, as a separate ground for reversal, that the trial judge "never gave specific consideration" to these issues is refuted by the record.

In sum, Gladys's testimony about Dickerson's prior abuse was relevant to explain that her failures to report his abuse of the children and her initial statements to authorities following Watson's death, which sought to minimize or hide her husband's culpability, were driven by her fear of being abused herself. And the trial court did not abuse its discretion in admitting the testimony, concluding that any prejudicial effect did not outweigh its probative value in explaining Gladys's behavior.

13

## 2. Dickerson was not entitled to a mistrial for his sister-in-law's testimony about her mother's suspicion of domestic violence.

Finding no error in the admission of Gladys's spousal-abuse testimony, the related claim of error involving the testimony of Crystal Howard, Gladys's sister, requires little discussion. Specifically, Dickerson claims that the trial court erred in refusing to grant a mistrial when, in testifying about how the relationship between Gladys and their mother had been "strained," she explained that their mother had a low opinion of Dickerson "because she suspected abuse towards Gladys and the children." Defense counsel immediately objected to this testimony on hearsay and character grounds, and requested a mistrial. While agreeing that the statement was not competent evidence, the trial court overruled the motion for a mistrial and, instead, admonished the jury to disregard the statement in its entirety.

Mistrials are an extreme remedy that should be granted only sparingly and upon a showing of manifest necessity. *Graves v. Commonwealth*, 285 S.W.3d 734, 737 (Ky.2009). Thus, trial courts are afforded broad discretion in deciding whether to grant a mistrial, and we review such decisions for abuse of that discretion. *Id.* Furthermore, a jury is usually presumed to follow instructions to disregard evidence erroneously presented to it. *Alexander v. Commonwealth*, 862 S.W.2d 856, 859 (Ky. 1993), *overruled on other grounds by Stringer v. Commonwealth*, 956 S.W.2d 883, 891 (Ky. 1993). Such admonitions are thus deemed to cure any error unless (1) "there is an overwhelming probability that the jury will be unable to follow the court's admonition and there is a strong likelihood that the effect of the inadmissible evidence would be

14

devastating to the defendant," or (2) "the question was asked without a factual basis and was inflammatory or highly prejudicial." *Johnson v. Commonwealth,* 105 S.W.3d 430, 441 (Ky. 2003) (internal quotation marks and emphases omitted). The second circumstance is inapplicable here.

As to the first exception to the presumption of admonition effectiveness, we are convinced neither that it was probable that the jury would disregard the admonition nor that the evidence was devastating to Dickerson, particularly in light of the other evidence that he abused his wife. Therefore, to the extent there was any error in the introduction of Howard's testimony, the admonition cured it. And because we can conceive of no manifest necessity for mistrial, there was certainly no abuse of discretion in declining to order one.

## B. Introduction of hearsay was not reversible error.

Dickerson next alleges error in the admission of hearsay testimony. Specifically, he raises two claims of error: first, he claims it was error to allow "medical hearsay" testimony from the pediatrician who examined Cameron and Alyssa after Watson's death; and second, he complains about "investigative hearsay" elicited from the detective who interrogated witnesses at the trailer park in Johnson County about the "white-headed boy" story.

### 1. Pediatrician's testimony about statements to her made during examination does not require reversal.

Dickerson claims that the trial court erred in allowing Dr. Kate Shutts, a pediatrician who had previously treated the Adkins children, to testify about statements made by the children during her medical examinations following Watson's death allegedly identifying the cause of their injuries (presumably, at

15

first blush, this means Dickerson's abuse). He further contends that it was error for the trial court, in overruling his hearsay objection, to summarily conclude that statements identifying abusers fall under KRE 803(4)'s exception for statements made for the purpose of medical treatment or diagnosis. Although the Commonwealth provided no response to this claim in its brief, we will not treat it as conceded.

At the outset, we note, yet again, that defense counsel did not cite to the record, complicating our review of the alleged error. Having nevertheless reviewed the video recording of the bench conference on defense counsel's contemporaneous objection to Dr. Shutts's testimony, as well as the portion of her testimony we believe the objection covered, it is apparent that the arguments in Dickerson's brief are overbroad regarding Dr. Shutts's testimony and the trial court's ruling.

Dickerson's argument conspicuously fails to make clear that the testimony by Dr. Shutts, which he alleges repeated "the various children's statements as to the identity of those who caused their injuries," in fact involved only two statements, both of which were attributed to Cameron. First, Dr. Shutts testified that Cameron told her that Dickerson had hit him with a belt (but apparently was unable to say where it hit him or to attribute any particular injury to it). Second, the doctor testified that the only other thing Cameron said was that the "big white boy" at their new trailer had "hurt his nose." (And according to Dr. Shutts, Cameron otherwise answered, "I don't know," when she asked him about his various injuries.) In our review of

16

Dr. Schutt's testimony, there is no mention of any statement by Alyssa identifying Dickerson or anybody else as the cause of any of her injuries.

And as to the trial court's ruling, Dickerson's contention that the judge overruled his objection by "stating without further analysis that the identity of the perpetrator was information necessary for medical treatment" is wholly refuted by the video record. Instead, it is clear the judge considered the parties' arguments (even asking defense counsel to clarify his objection) before advising the Commonwealth that he was getting close to exceeding the scope of the KRE 803(4) exception—that he was "starting to teeter."

And it is also notable, although Dickerson failed to mention it as well, that the Commonwealth asked no further questions of Dr. Shutts following the bench conference. Simply put, there is no error, and even if there were, it would certainly be harmless.

## 2. Admission of detective's hearsay testimony in violation of Dickerson's confrontation rights was harmless beyond a reasonable doubt.

Next, Dickerson claims that it was error to allow the Commonwealth to elicit so-called "investigative hearsay" testimony from Detective Ryan Hamilton. Detective Hamilton investigated the statements both Dickersons gave to authorities attributing Watson's fatal injury to physical attack by the "white-headed boy" on the playground or swing-set at the Johnson County trailer park, and Dickerson contends that it was error to allow the detective to testify that nothing he was told by the fourteen witnesses he interviewed provided any evidence that there was any truth to that story.

In its case-in-chief, the Commonwealth questioned Detective Hamilton about the Dickersons' recorded statements involving the white-headed boy, in which they had claimed the boy had attacked and injured Watson two days before his death. After having the detective recount the story, the following exchange took place:

Commonwealth: Now this swing-set, playground, white-headed boy thing, story, did you investigate that?

Det. Hamilton: Yes.

Commonwealth: And how did you investigate that?

Det. Hamilton: I went to the trailer park and interviewed the residents in the trailer park. I located the boy they referred to as the "white-headed boy." I spoke to him and to his parents. I also located the swing-set and photographed it, and the owners of the swing-set and interviewed them.

Commonwealth: And how many people in all, if you know, did you interview investigating this swing-set, white-headed-boy story?

Det. Hamilton: At the trailer park, approximately fourteen different people.

Commonwealth: Okay. And after you concluded your investigation into that, into that claim about Watson or Cameron being injured by a white-headed boy—

At that point, defense counsel interjected, objecting that the Commonwealth was preparing to ask Detective Hamilton to testify as to hearsay statements by his investigation interviewees in violation of his confrontation rights. The Commonwealth's Attorney responded that the testimony he was going to elicit would not be hearsay because he was not going to ask about any specific statements of any of the witnesses. The trial court overruled the objection, and

18

the Commonwealth concluded the exchange with Detective Hamilton by asking, "After investigating the claims about the playground incident, did you find any evidence at all to suggest that anything like what the defendant described ever occurred?" Detective Hamilton responded, "No."

On appeal, the Commonwealth maintains that the detective's response did not constitute hearsay, and was therefore properly admitted, because the testimony did not repeat any express statements from the interview subjects. According to the Commonwealth, because the detective was merely responding to a question posed by the prosecutor that called for a summary of all of his interviews, it was "impossible for the detective to be repeating statements made by fourteen ... different persons." The Commonwealth claims that Detective Hamilton's testimony thus involved a conclusion he drew from his investigation of the story about the white-headed boy and not any statement made by an out-of-court declarant that might otherwise be objectionable hearsay.

The flaw in this argument is that it is premised on a much-too-couched understanding of hearsay. "Hearsay" is an out-of-court statement "offered in evidence to prove the truth of the matter asserted." KRE 801(c). Here, the fourteen interviewees made the out-of-court statements asserting the matter offered into evidence—that the story about the white-headed boy was untrue. And the in-court testimony relaying those out-of-court statements to the jury, albeit by summarizing them, was certainly offered to prove the truth of the matter they asserted. Merely summarizing hearsay statements does not change

19

their hearsay character.[4] Indeed, allowing a witness to recount the substance of a statement and avoid the hearsay bar by omitting the magic words "he said" or "she said" would essentially kill the hearsay rule. And even that approach would violate other rules, such as KRS 602's requirement that a witness may testify only to matters of which he or she has personal knowledge, unless the statements were admissible under a hearsay exception.

It is a witness's testimony about the substance of an out-of-court speaker's statement, and not merely a verbatim recitation of the statement, that is problematic and barred by the hearsay rule. A police officer's "conclusion" or "summary" of information gleaned from investigatory interviews, such as Detective Hamilton's testimony here, is no less hearsay than the interviewees' statements on which it is based. *Cf. Hodge v. Commonwealth*, 287 S.W.2d 426, 428 (Ky. 1956) (holding opinions and conclusions of state trooper in official auto-accident report were "pure hearsay").

And this understanding of hearsay is implicit to this Court's holding in the seminal case *Sanborn v. Commonwealth*, 754 S.W.2d 534 (Ky. 1988), *overruled on other grounds by Hudson v. Commonwealth*, 202 S.W.3d 17 (Ky.

---

[4] While we have not been provided with, nor found through our own research, any prior cases in which this Court has expressly stated as much, we have at least hinted at it in dicta. *See Barshars v. Commonwealth*, 25 S.W.3d 58, 64 (Ky. 2000) (noting that "the Kentucky Rules of Evidence contain no requirement that ... testimony relating to a declarant's oral statement must be a verbatim recitation of that statement," and "by paraphrasing, witnesses may communicate relevant evidence regarding the substance of a declarant's statement").

2006), which debunked once and for all (or at least attempted to[5]) the myth of the so-called "investigative hearsay" exception. *Id.* at 541. In *Sanborn,* this Court held, among other things, that a police officer's testimony about conclusions that were drawn from interviewing dozens of people—in substance, that "he did not obtain any information from the people whom he interviewed verifying the appellant's alibi"—was inadmissible hearsay. *Id.* at 542. There, as here, the officer was merely regurgitating information furnished to him by the people he had interviewed, namely, that the defendant's version of events was not true. The out-of-court statements by which that information was conveyed to the officer were inadmissible hearsay, and repackaging them into the officer's "conclusion" or "summary" did not make that information any less objectionable.

It is no different here, where Detective Hamilton's testimony was essentially that the fourteen or so people he interviewed during his investigation stated that there was no truth to the Dickersons' story. That is hearsay.

Having rejected the Commonwealth's contention that Detective Hamilton's testimony about the results of his trailer-park interviews was not hearsay, we turn now to the merits of whether its admission was error. On that point, and citing *Sanborn,* Dickerson disputes the admissibility of this testimony as non-hearsay (or "verbal-act") evidence of the actions taken by the

---

[5] *See Ruiz v. Commonwealth,* 471 S.W.3d 675, 680–81 (Ky. 2015) (lamenting the dogged persistence of the false "investigative hearsay" exception among the bench and bar, despite *Sanborn* and its progeny's clear condemnations of it).

detective in response to the out-of-court statements, where the detective's actions were not relevant to any issue in the case. His insistence on this point is somewhat curious, however, since nobody in the trial court below or now on appeal has ever suggested otherwise. In any event, we agree that the detective's testimony here was not admissible for that (non-hearsay) purpose; the detective's actions were in no way at issue.

The real problem with the complained-about testimony, which Dickerson's argument hints at but fails to fully develop, is that it implicates his Sixth Amendment confrontation rights. *See* U.S. Const. amend. VI ("In all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him."). The Confrontation Clause forbids the "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." *Crawford v. Washington*, 541 U.S. 36, 53–54 (2004); *see also Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 309 (2009) ("A witness's testimony against a defendant is ... inadmissible unless the witness appears at trial or, if the witness is unavailable, the defendant had a prior opportunity for cross-examination." (citing *Crawford*, 541 U.S. at 54)). So whether Detective Hamilton's testimony summarizing his interviews with the trailer-park witnesses violated Dickerson's confrontation rights turns on whether (1) the out-of-court statements were testimonial, (2) the out-of-court speakers were unavailable to testify, and (3) Dickerson had an opportunity to cross-examine them.

First, it is beyond dispute that the hearsay statements here were testimonial; they were made to law enforcement in the course of an investigation that was undertaken solely to discover facts and evidence that might prove relevant in a subsequent criminal prosecution, and thus were prototypical of testimonial hearsay. As the Supreme Court initially noted in *Crawford*, testimonial hearsay "applies at a minimum ... to police interrogations." 541 U.S. at 68. Despite the Supreme Court's subsequent cases qualifying that broad assertion, *see, e.g., Davis v. Washington*, 547 U.S. 813, 822 (2006) (holding that statements to police are non-testimonial when their primary purpose was to assist in responding to an ongoing emergency), it nevertheless remains the arguably self-evident rule that statements to police "are testimonial when the circumstances objectively indicate that there is no ... ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution," *id.*; *see also Ohio v. Clark*, 135 S. Ct. 2173, 2180 (2015) ("In the end, the question is whether, in light of all the circumstances, viewed objectively, the primary purpose of the conversation was to create an out-of-court substitute for trial testimony." (internal quotation marks and brackets omitted) (quoting *Michigan v. Bryant*, 562 U.S. 344, 358 (2011))).

Here, there is no dispute that the purpose of Detective Hamilton's interrogations of the trailer-park residents was to investigate past events—the white-headed boy's alleged role in Watson's death—for later criminal prosecution. There is little doubt that their primary purpose, then, was to create an out-of-court substitute for in-court testimony; and this forbidden

23

result was, in fact, obtained through the detective's summary at trial of the out-of-court interviewees' statements. Thus, it is clear that the out-of-court statements to the detective—presented, as they were, to the jury through Detective Hamilton's summary testimony about their content including nothing that substantiated Dickerson's white-headed-boy allegations—were testimonial in the truest sense of the word.

Whether the Confrontation Clause barred this testimonial hearsay thus turns on whether the out-of-court interviewees were unavailable and Dickerson had an opportunity to cross-examine them. Neither of these points is seriously contested, at least with respect to the lion's share of the interviewees. The Commonwealth showed neither that non-testifying witnesses interviewed by Detective Hamilton at the trailer park were unavailable nor that Dickerson had a prior opportunity to cross-examine them.

That said, four of those witnesses were called by the Commonwealth to testify at Dickerson's trial. With respect to those four witnesses, there is no confrontation violation because they actually testified at trial (and, thus, were available and subject to cross-examination). While the detective still should have been barred from summarizing what these witnesses told him—at least until they first appeared as witnesses and had been cross-examined, after which he might have then been allowed to testify to their prior consistent statements for rehabilitation purposes, *see* KRE 801A(2)—the constitutional error with respect to them, at least, "was erased by subsequent legitimation of the incompetent testimony." *Garland v. Commonwealth,* 127 S.W.3d 529, 540 (Ky. 2004), *overruled on other grounds by Lanham v. Commonwealth,* 171

24

S.W.3d 14 (Ky. 2005) (quoting *Summitt v. Commonwealth*, 550 S.W.2d 548, 550 (Ky. 1977)).

That is not to suggest, however, that the confrontation violation was cured altogether. Because the detective's testimony, by virtue of its summary nature, also encompassed the out-of-court testimonial hearsay of the other nine or so witnesses he interviewed, it still violated Dickerson's right to confront those out-of-court witnesses under *Crawford*.

But finding a violation of Dickerson's confrontation rights alone does not necessarily require reversal of his convictions, which is required only if the error was not harmless. *See* RCr 9.24. Because this was a constitutional error, the harmlessness threshold is much higher than for non-constitutional errors; the standard here is whether we are convinced "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Chapman v. California*, 386 U.S. 18, 24 (1967); *see also Taylor v. Commonwealth*, 175 S.W.3d 68, 72 (Ky. 2005) (applying constitutional-harmless-error analysis to *Crawford* violation).

As this Court has explained, the analysis "involves considering the improper evidence in the context of the entire trial and asking whether there is a 'reasonable possibility that the evidence complained of might have contributed to the conviction.'" *Staples v. Commonwealth*, 454 S.W.3d 803, 826–27 (Ky. 2014) (quoting *Talbott v. Commonwealth*, 968 S.W.2d 76, 84 (Ky. 1998)). "The question ... is whether the improper evidence was of a weight, was of a striking enough nature, or played a prominent enough role in the

Commonwealth's case to raise a reasonable possibility that it contributed to the conviction." *Id.* at 827.

With this standard in mind, examining the nature of the constitutionally offensive evidence in the context of the entire trial, and in light of the overwhelming evidence of Dickerson's guilt, we must conclude that this is just such a case where the improper evidence was harmless beyond a reasonable doubt. Simply put, we are convinced that no reasonable juror would have relied on the unconstitutional evidence in convicting Dickerson. Thus, there was no reasonable possibility that it contributed to his conviction.

Again, four of the trailer-park witnesses interviewed by Detective Hamilton testified at trial. At trial, their testimony fleshed out and solidified the speciousness of the story about the white-headed boy. In that respect, then, Detective Hamilton's short summary of the other, non-testifying witnesses' statements was not only cumulative to the in-court witnesses' testimony, but also was much less compelling. The boiled-down hearsay information was conveyed to the jury by Detective Hamilton with his one-word response, "No," to a largely unremarkable, albeit improper, question. It was hardly a salacious or climactic moment of the trial.

But what further, and most definitively, demonstrates the harmlessness of the error is defense counsel's own closing arguments. Toward the beginning of his argument, defense counsel spent almost ten minutes arguing to the jury about why it should disregard Gladys's trial testimony (that Dickerson, alone, had inflicted the fatal abuse) and should, instead, believe his theory that it was

Gladys who had caused the child's death and who was now trying to pin it on him.

To this end, defense counsel brought up how Gladys, in the midst of the 911 call and unprompted, had cut in with the story about a bigger boy attacking and kicking Watson at the trailer-park playground. He then asked, "Does that sound like the kind of person who respects the truth, offers the truth? Or does that sound like a person who will say anything to get themselves in a better situation?" This implicit acknowledgement that the story was untrue became explicit a few minutes later, when he called it a "made-up piece of business."

Given that his counsel made these arguments at trial, the manifest futility of now arguing on appeal that the detective's testimony regarding the made-up story prejudiced him is apparent.

For the sake of completeness, however, we conclude by again noting the other voluminous evidence introduced against Dickerson, which was as compelling in its quantity and consistency as it was horrific in its heart-breaking and graphic detail. It would not be a stretch to say that there would have been little chance of acquittal based on the evidence of Watson's and the other children's injuries alone. But along with the photographic evidence and the testimony from the medical examiner, the children's pediatrician, and the child-abuse-pediatrics specialist, the Commonwealth also introduced direct eye-witness testimony of Dickerson's physical abuse of the children, both from one of his child-abuse victims (Braxton) and from his wife.

In addition to their detailed accounts of the almost unfathomably severe physical and emotional trauma Dickerson inflicted on the four children, what is perhaps most remarkable about these two witnesses is how well each witness's testimony about the abuse corroborated the other's. The significance of this is apparent, of course, especially given that Braxton and Gladys had not had any contact since Braxton's father took custody of him three months before Watson's death. (And neither witness heard the testimony of the other because, as would be expected, the parties invoked "the rule" for sequestration of witnesses during trial.) This marked corroboration, which was further substantiated by the medical proof, not only significantly bolstered their credibility, but rendered their testimony about Dickerson's abuse of the children largely, if not wholly, unassailable.

In summation, the detective's testimony about his interviewees' statements was testimonial hearsay, and since they did not testify at trial and Dickerson was not afforded an opportunity for cross-examination of the unavailable witnesses, the admission of that testimony violated his Sixth Amendment confrontation rights under *Crawford*. However, because the harm, if any, that flowed from the admission of the improper evidence was minimal at best, and in light of the great strength and extent of the evidence of Dickerson's guilt, it is abundantly clear that the constitutional error was harmless beyond a reasonable doubt.

## C. Prosecutorial misconduct does not justify reversal.

Finally, Dickerson claims that reversal is required for several instances of alleged prosecutorial misconduct during the Commonwealth's cross-examination of the defense's medical expert and during closing argument.

Prosecutorial misconduct is "a prosecutor's improper or illegal act involving an attempt to persuade the jury to wrongly convict a defendant or assess an unjustified punishment." *Noakes v. Commonwealth*, 354 S.W.3d 116, 121 (Ky. 2011) (alterations omitted) (quoting *Black's Law Dictionary* (9th ed. 2009)). It can take a variety of forms, including improper questioning and improper closing argument. *Duncan v. Commonwealth*, 322 S.W.3d 81, 87 (Ky. 2010).

We will reverse for prosecutorial misconduct only if the misconduct was "flagrant" or if we find all of the following to be true: (1) the proof of guilt is not overwhelming, (2) a contemporaneous objection was made, and (3) the trial court failed to cure the misconduct with a sufficient admonition. *Mayo v. Commonwealth*, 322 S.W.3d 41, 55 (Ky. 2010). As to the second ground for justifying reversal, the three-part test for non-flagrant errors, none of the alleged misconduct here will satisfy that standard because the evidence against Dickerson was overwhelming (as we have already explained above). In other words, no non-flagrant misconduct, even if it was objected to, will justify reversal here because "proof of the defendant's guilt was ... such as to render the [non-flagrant] misconduct harmless." *Duncan*, 322 S.W.3d at 87.

As a result, whether any of the alleged prosecutorial misconduct here requires reversal turns solely on whether it was "flagrant" so as to have

29

"render[ed] the trial fundamentally unfair." *Id.* We use the following four-factor test to determine whether a prosecutor's improper comments constitute reversible flagrant misconduct: "(1) whether the remarks tended to mislead the jury or to prejudice the accused; (2) whether they were isolated or extensive; (3) whether they were deliberately or accidentally placed before the jury; and (4) the strength of the evidence against the accused." *Mayo,* 322 S.W.3d at 56 (quoting *Hannah v. Commonwealth,* 306 S.W.3d 509, 518 (Ky. 2010)). In the end, our review must center on the essential fairness of the trial as a whole, with reversal being justified only if the prosecutor's misconduct was "so improper, prejudicial, and egregious as to have undermined the overall fairness of the proceedings." *Brewer v. Commonwealth,* 206 S.W.3d 343, 349 (Ky. 2006) (citing *Soto v. Commonwealth,* 139 S.W.3d 827, 873 (Ky. 2004)); *see also* *Slaughter v. Commonwealth,* 744 S.W.2d 407, 411–12 (Ky. 1987) ("The required analysis ... must focus on the overall fairness of the trial, and not the culpability of the prosecutor." (citing *Smith v. Phillips,* 455 U.S. 209 (1982)).

With those principles in mind, we address the allegations of misconduct in turn.

### 1. Cross-examination of defense expert witness was not flagrant prosecutorial misconduct.

First, Dickerson alleges prosecutorial misconduct during the Commonwealth's cross-examination of his medical expert, Dr. Charles Wetli. Specifically, he complains about the following statement by the prosecutor: "All the evidence in this case has been that Watson was severely assaulted by Jason Dickerson the night before he died." Although he failed to acknowledge

30

as much in his brief, defense counsel immediately objected to this statement, and following a very brief bench conference, the Commonwealth rephrased that assertion of fact into a hypothetical before proceeding with questioning the witness.[6] No additional relief was requested or provided. While we agree that the prosecutor's initial statement was improper—because it was hyperbole that invaded the jury's fact-finding role by asserting as fact the prosecutor's own conclusions about the weight and credibility of the evidence—we disagree that it requires reversal because application of the four-factor test laid out above leads us to conclude that it did not rise to the level of flagrant misconduct.

As to the first factor, it is unlikely that the jury was misled by the remark. When the remark was made (on the fifth day of a five-day trial), the jury had already heard all of the Commonwealth's and almost all of the defense's evidence and would have easily recognized the prosecutor's hyperbolic assertion for what it was and to what degree it may or may not have aligned with their view of that evidence. Plus, insofar as the prosecutor rephrased the comment before continuing questioning, the jury would have considered it less as an assertion of fact than as the hypothetical premise on which the prosecutor based his continued questioning of the witness, thus curing any misleading effect the assertion may have had when made. This factor, therefore, weighs against finding flagrancy.

---

[6] In relevant part, the Commonwealth's rephrased question asked, "Doctor, if there's evidence that's been presented in this case to say that Watson was severely assaulted the night before he died, perhaps as late as midnight or later—and that ... he was not assaulted th[e] afternoon [of the day he died] ..., you're saying that the autopsy results are not consistent with that?"

31

The second factor requires little discussion. The prosecutor's improper comment was undoubtedly isolated as it was made once, objected to, and not repeated. This factor, too, weighs in favor of non-flagrancy.

As to whether the comment was made deliberately or accidentally, the fact that the prosecutor responded to the objection by voluntarily agreeing to rephrase the statement as a hypothetical, we believe, tends to demonstrate that his utterance of the objectionable assertion was more accidental than deliberate. Again, he did not repeat the improper remark. Thus, while perhaps less clear than the first two factors, we believe that this factor too weighs against finding the improper comment flagrant.

Lastly, as to the fourth factor concerning the strength of the evidence, we have already made clear how strong the evidence of Dickerson's guilt was. This is yet another factor weighing in favor of finding non-flagrancy.

With all four factors thus weighing in the Commonwealth's favor, it is clear that the improper comment did not rise to the level of flagrant misconduct and does not warrant reversal accordingly.

Additionally, Dickerson alleges misconduct in "numerous statements of personal opinion" by the prosecutor and "unfairly attack[ing] Dr. Wetli during cross, rapid-firing multiple questions at the doctor, while refusing to allow him to answer." He does not elaborate any further, however, on the substance or character of any such alleged personal-opinion statements or purported machine-gun style questioning, nor does he cite where this questioning appears in the record. Worse still, he did not endeavor to point out any other specific statements or lines of questioning to substantiate these broad,

32

unsupported claims. Again, we reiterate it is the appellant's obligation under Civil Rule 76.12 to sift through the record and provide adequate citation thereto to provide this Court with the basis for a claim of relief. Dickerson failed to do so here. Therefore, we find this aspect of his claim of prosecutorial misconduct wanting.

### 2. Improper closing argument statements did not rise to the level of flagrant misconduct to require reversal.

Dickerson's remaining allegations of prosecutorial misconduct relate to numerous statements made during the Commonwealth's closing argument. In reviewing such claims, "we must always consider these closing arguments 'as a whole' and keep in mind the wide latitude we allow parties during closing arguments." *Miller v. Commonwealth*, 283 S.W.3d 690, 704 (Ky. 2009) (quoting *Young v. Commonwealth*, 25 S.W.3d 66, 74–75 (Ky. 2000)).

First, he complains about the prosecutor's statement toward the beginning of his argument: "I've been doing this for going on 16 years, and I've seen a lot, but I've never seen anything like this." Defense counsel immediately objected to this statement of personal opinion and experience, and following a brief bench conference, the trial court directed the Commonwealth's Attorney to "move it along." The prosecutor made no further reference to his personal experience, and no additional relief was requested.

Applying the four-factor test above, we conclude that this did not constitute flagrant misconduct. It did not tend to mislead the jury and was not particularly prejudicial. The personal sentiment behind the statement was uttered only this one, isolated time and was not revisited. And even if it were

33

deliberate, the strength of the damning evidence against Dickerson militates against finding that it was flagrant misconduct.

Next, Dickerson complains about what he characterizes as the prosecutor's closing-argument statements "repeatedly interjecting his personal opinions that the Defendant [wa]s 'stupid,' a 'moron,' 'evil,' 'bogus,' and 'full of crap.'" Again, he failed to include any specific citations to the record to point out the actual statements that formed the basis of his claim. However, because our full consideration of the prosecutorial misconduct claims necessitated our independent review of the entirety of the Commonwealth's closing argument, we came across the statements his claim appears to allude to. However, upon listening to the full comments in context, it is clear that Dickerson's argument is somewhat misleading.

Despite Dickerson's characterization of them as such, none of the prosecutor's remarks specifically attached those complained-about terms to Dickerson himself. Instead, the prosecutor argued that "what this man did [to the children] was evil"; that Dickerson, in his responses to police upon first being questioned, had not sounded like someone that was innocent but, instead, had sounded like someone that already knew what had happened and was trying to think of "some kind of crap" to get out of it; that during questioning by police a second time following arrest, "any moron" would have understood they were talking about murder and not just abuse; and that the swing-set story was "stupid," "bogus," and a "bunch of crap" (which, as

34

discussed above, were sentiments already raised by defense counsel during his closing argument to attack the credibility of Gladys Dickerson[7]).

We need not reach the question whether these alleged "interject[ions] of personal opinion" rise to the level of flagrant misconduct because we do not believe they constituted misconduct at all. First, all of the comments must be viewed through the lens of the wide latitude counsel is afforded in closing arguments. They are, after all, just that—*arguments*. "A prosecutor may comment on tactics, may comment on evidence, and may comment as to the falsity of the defense position." *Slaughter v. Commonwealth*, 744 S.W.2d 407, 412 (Ky. 1987). As this Court has previously held, the prosecutor does not exceed the proper bounds of closing argument by characterizing the defense theory as "stupid." *See Stopher v. Commonwealth*, 57 S.W.3d 787, 805–06 (Ky. 2001); *see also Slaughter*, 744 S.W.2d at 412 (approving criticism of defense counsel for presenting a "great octopus" defense and pulling a "scam," and questioning counsel's intelligence). And we have long recognized that it is permissible for prosecutors to comment on the veracity or credibility of witnesses. *Chumbler v. Commonwealth*, 905 S.W.2d 488, 503 (Ky. 1995) (citing *Cavins v. Commonwealth*, 272 S.W.2d 656 (Ky. 1954)). Finally, this Court has consistently held it is proper for prosecutors to express personal opinions about defendants' guilt that are based on the evidence in the case. *See, e.g.*,

---

[7] And, for a little context, it is clear from the prosecutor's statements during closing that the only reason he even mentioned the "bogus" story during closing was because defense counsel himself had brought it up during his argument to attack Gladys's credibility. The prosecutor then smartly pointed out to the jury, although it was unlikely that it was lost on any of them, that the defendant himself had tried to sell the same "stupid" story to police during both of his recorded statements.

*Slaughter*, 744 S.W.2d at 412 (holding reference to defendant as a "bit of evil" permissible). It follows, then, that the comments at issue here were not improper, let alone misconduct, flagrant or otherwise.

Finally, Dickerson alleges misconduct in certain closing-argument statements disparaging the credibility of Dr. Wetli. Specifically, after pointing out how the two-part conclusion in the expert's report regarding the timeframe of Watson's fatal injuries was inherently self-contradictory—and labeling the expert's opinion thus "illogical" and "worthless"—the prosecutor's closing-argument criticism of Dr. Wetli continued as follows:

> Commonwealth: If anybody thought I was being too rough, being too hard on him [during cross-examination], I'm sorry. But it offends me—and it ought to offend you—when a man comes in here and takes facts and twists them for a dollar, when we have a dead child here. And if I acted outraged, it's because I was outraged. He's a hired gun that says whatever the person paying him the money to say, that's what he says.

> Defense Counsel: For the record, your honor, we object to this.

> Trial Court: Noted.

The prosecutor then shifted to discussing the fee Dr. Wetli was paid to testify in this case and how much he had been paid in total per year (about $500,000) doing nothing but testifying as an expert witness since he retired from being a coroner in 2006. The argument then turned to comparing Dr. Wetli to the other medical experts who testified in the case, Dr. Rolf and Dr. Currie, noting their qualifications and perceived lack of bias, before asking the following:

> Commonwealth: "Who you gonna believe? ... You gonna believe [Dr. Rolf and Dr. Currie]? Or some hired whore who comes in here and tells you all this crap and has become a multimillionaire on the backs

36

of dead children like Watson Adkins, is that who you're gonna believe?

Defense Counsel: Note our objection, your honor.

Trial Court: Sustained. Ladies and gentlemen of the jury, you are to disregard [the Commonwealth's Attorney's] description of Dr. Wetli regarding the term "whore."

No further relief was requested. And the prosecutor moved on to discuss other evidence in the case without further comment on Dr. Wetli.

We agree with Dickerson that the foregoing closing-argument remarks were improper. While counsel is permitted to comment on the credibility of witnesses and perceived weaknesses in the other party's case, these comments, in their totality, exceeded the bounds of permissible commentary.

To be sure, it is not improper, as a general matter, to comment on a witness's credibility and possible bias through, for example, pointing out how much he was paid to give his opinion in this and other cases, if such comments are supported by the evidence. Indeed, several of these comments, taken alone, were certainly proper. We have no intention, for example, for the commonly used phrase "hired gun" to be eliminated from the lexicon of our trial lawyers out of fear of violating this opinion. *Cf. Hale v. Commonwealth*, 396 S.W.3d 841, 850–51 (Ky. 2013) (characterizing "no harm done" defense as "offensive" was not improper).

But when considered as a whole, the prosecutor's remarks here went too far in conveying inflammatory, emotional expressions of personal offense and "outrage," as well as particularly provocative claims that the witness had gotten wealthy at the expense of murdered children. This is inarguably outside the

37

bounds of proper argument and is unbefitting of a prosecutor who, above all else, is tasked with seeking a fair and true verdict based on the evidence in the case. "[I]t is his duty to see that no statement that is calculated to ... stir up prejudice in [the jurors'] minds is made." *Bowling v. Commonwealth*, 279 S.W.2d 23, 25 (Ky. 1955). It is clear that the prosecutor violated that duty here.

That these remarks were improper alone does not end our inquiry, however, because again reversal is justified only if the improper closing-argument comments were flagrant and, as such, rendered the trial fundamentally unfair. So to determine whether the improper comments require reversal, we must again refer back to the four-factor test for flagrancy.

As to the first factor, while we do not believe the remarks mislead the jury, they did tend to prejudice Dickerson. They contained incendiary expressions of the prosecutor's personal ire towards the defense expert and were certainly geared towards evoking a similar emotional response in the jury. Their probable effect, then, was to encourage the jury to summarily reject the expert's opinion—which was, of course, the tenuous foundation on which the viability of Dickerson's "alibi" defense depended—as not only incredible, but worthy of scorn. Obviously, this factor weighs in Dickerson's favor.

As to the second factor, the prosecutor's improper closing-argument comments about Dr. Wetli were isolated. Of the Commonwealth's approximately one-and-one-half-hour closing argument at the conclusion of the five-day trial, the prosecutor's entire discussion of Dr. Wetli lasted only about five minutes. And the improper comments, including defense counsel's

38

objections and the trial court's admonition, constituted only about one minute of that time. So this factor weighs in the Commonwealth's favor.

The third factor, on the other hand, weighs against the Commonwealth because there can be little, if any, doubt that the prosecutor put them before the jury quite deliberately. It cannot be reasonably argued that it was only by accident that the prosecutor let slip in front of the jury his belief that the defense expert had gotten rich on the "backs of dead children" and that they should be as "outraged" about it as him. Thus, this factor too weighs in Dickerson's favor.

Finally, as we note throughout this opinion, the fourth factor—the strength of the evidence of Dickerson's guilt—greatly weighs in the Commonwealth's favor.

Therefore, the results of the four-factor test for flagrancy are a relative wash: two factors weigh in Dickerson's favor, and two weigh in the Commonwealth's. When faced with such a "state of relative equipoise," to determine whether relief is appropriate, we must revert to the overarching focus of appellate review of prosecutorial misconduct: "an examination of the trial as a whole to determine if the improper comments undermined the essential fairness of [Dickerson's] trial." *Mayo*, 322 S.W.3d at 57.

In assessing whether the prosecutor's improper statements about Dr. Wetli rendered Dickerson's trial fundamentally unfair, the significance of the mountainous evidence against him cannot be understated. The fundamental-fairness inquiry, in essence, turns on whether the prosecutor's comments risked causing the jury to convict Dickerson based on inflamed

39

passions or prejudice, rather than the evidence. In this regard, we are convinced that the jury based its guilty verdict on the detailed and essentially irrefutable medical, photographic, and testimonial evidence of the extensive physical trauma incurred by Watson and the other children; the expert opinions from Drs. Rolf and Currie explaining how those injuries could have reasonably only been caused by severe physical abuse; and the testimony of Braxton describing (and acting out), in graphic detail, the various means by which Dickerson had exacted such abuse.

In addition to this overwhelmingly compelling proof of guilt, there was substantial other testimony elicited from numerous other sources—neighbors, family members, friends, etc.—that, while being less direct or only circumstantial evidence of guilt, was nevertheless highly incriminating and corroborative of the direct proof. We are unconvinced that the jury's verdict was based on anything other than this voluminous, compelling body of evidence of Dickerson's guilt.

In addition, it is also relevant that the trial court took corrective action, admonishing the jury to disregard the "whore" descriptor. While this admonition, standing alone, would likely have been insufficient to wholly cure the improper comments, it is nevertheless a factor to consider when evaluating how the comments affected the overall fairness of the trial. This is especially so given that Dickerson received all (or, rather, more) relief from the trial court than he sought in making his contemporaneous objection (which, as it were, was none). As in *Mayo*, we decline to find on appeal that the trial court should

have taken even more initiative than it did here to grant Dickerson more relief than he requested. *See* 322 S.W.3d at 57.

In conclusion, while the improper remarks about Dr. Wetli were certainly troubling, they were not so egregious or prejudicial to have undermined the fairness of Dickerson's trial as a whole. That notwithstanding, counsel should take caution not to replicate the prosecutor's error here. Our holding is particular to this case and should not be read as allowing these kinds of personal, emotive attacks on witnesses to be made with impunity; such comments are undoubtedly improper, far-exceed the permissible bounds of closing arguments, and will often justify reversal in future cases.

### III. Conclusion

Because none of Dickerson's claims of error require reversal, the judgment of conviction and sentence of the Floyd Circuit Court is affirmed.

Minton, C.J.; Cunningham, Hughes, Keller and Venters, JJ., concur. Wright, J., not sitting.

COUNSEL FOR APPELLANT:

Ned Barry Pillersdorf
Pillersdorf, Derossett & Lane
124 West Court Street
Prestonsburg, Kentucky 41653

COUNSEL FOR APPELLEE:

Andy Beshear
Attorney General

Leilani K. M. Martin
Assistant Attorney General
Office of Criminal Appeals
Office of the Attorney General
1024 Capital Center Drive
Frankfort, Kentucky 40601