# IMPORTANT NOTICE
## NOT TO BE PUBLISHED OPINION

THIS OPINION IS DESIGNATED "NOT TO BE PUBLISHED." PURSUANT TO THE RULES OF CIVIL PROCEDURE PROMULGATED BY THE SUPREME COURT, CR 76.28(4)(C), THIS OPINION IS NOT TO BE PUBLISHED AND SHALL NOT BE CITED OR USED AS BINDING PRECEDENT IN ANY OTHER CASE IN ANY COURT OF THIS STATE; HOWEVER, UNPUBLISHED KENTUCKY APPELLATE DECISIONS, RENDERED AFTER JANUARY 1, 2003, MAY BE CITED FOR CONSIDERATION BY THE COURT IF THERE IS NO PUBLISHED OPINION THAT WOULD ADEQUATELY ADDRESS THE ISSUE BEFORE THE COURT. OPINIONS CITED FOR CONSIDERATION BY THE COURT SHALL BE SET OUT AS AN UNPUBLISHED DECISION IN THE FILED DOCUMENT AND A COPY OF THE ENTIRE DECISION SHALL BE TENDERED ALONG WITH THE DOCUMENT TO THE COURT AND ALL PARTIES TO THE ACTION.


# Supreme Court of Kentucky
### 2019-SC-000076-TG

DATE 7/30/20
A Hutcheson

JEFFREY JONES         APPELLANT

ON TRANSFER FROM COURT OF APPEALS
V.         CASE NO. 2019-CA-000057-MR
MARION CIRCUIT COURT NO. 18-CR-00101
HONORABLE SAMUEL T. SPALDING, JUDGE

COMMONWEALTH OF KENTUCKY         APPELLEE

## MEMORANDUM OPINION OF THE COURT

### AFFIRMING

A Marion County jury found Jeffrey Jones guilty of second-degree assault and being a first-degree Persistent Felony Offender (PFO). The trial court sentenced Jones to twenty years in prison in accordance with the jury's recommendation. Jones raises several issues on appeal, including the trial court's refusal to instruct the jury on extreme emotional disturbance (EED) and admission of evidence allegedly contrary to Kentucky Rule of Evidence (KRE) 404(b), as well as the prosecutor's alleged misconduct. After careful review, we affirm the trial court.

### FACTS AND PROCEDURAL HISTORY

Jeffrey Jones was charged with first-degree assault, tampering with physical evidence, resisting arrest, six counts of third-degree criminal mischief and being a first-degree PFO. The charges stemmed from allegations that

Jones beat James Burdine with a hammer, causing serious physical injury and then tampered with evidence by trying to hide the hammer. Additionally, Jones was charged with causing six troopers called to the crime scene to walk through briars behind a shed in an effort to find him, damaging their clothing. Finally, once apprehended by police, Jones took his hands off the hood of his car after being told not to do so. Jones and Burdine both testified at trial and told different versions of the night's events.

On March 4, 2018 Jones was going through a foreclosure. He rented a U-Haul to remove personal property from his home. He owned another property near the foreclosed home, so he loaded the U-Haul with his belongings and took them to a shed on the nearby property. Jones hired Robert Spurling and James Burdine to help him move.

Burdine testified that he was helping Jones move his belongings from his foreclosed home to a shed, but that he, Burdine, was not helping load or unload the boxes because he had a pinched nerve from a back surgery and walked with a cane. Burdine stated that the men were drinking, and everything was going smoothly. Burdine's wife, Tara Lyons, called and wanted him home for dinner so Burdine asked Jones to take him home, but Jones refused. Burdine stated that he then asked his wife to come pick him up and he said he was at a "burnt down" house that was situated before Jones's house. Hearing the remark, Jones came at him with a hammer in his hand and warned him not to tell anyone he burnt down a house.

2

Burdine tried explaining to Jones that he was merely describing his location to his wife, using the house as a landmark. The two began arguing. Burdine testified that he grabbed the hammer, causing Jones to fall back and Burdine landed on top of him. Burdine asked Jones why he was acting like that, and Jones apologized and told Burdine to get up. Then Jones told him that he needed to get off his property. Burdine called his wife to tell her to hurry up. While he was on the phone, Jones said, "here, tell her this," and hit Burdine on the back of the head with a hammer, causing him to black out. When Burdine awoke, Jones was sitting on Burdine's chest hitting him with the hammer, saying, "die, son of a bitch, die." Burdine testified that he could not see but kept hitting redial on his phone. He stated that he knocked the hammer so that Jones could not reach it, but Jones then grabbed him around the neck.

At that point Lyons arrived with the couple's daughter and the daughter's fiancé. Burdine's daughter testified that she could hear her father screaming, so she jumped out of the truck and ran toward him. She stated that she saw Jones on top of Burdine and could see a lot of blood. She tried to get Jones off her father, but Jones came at her. By that time her fiancé made it to the scene and Jones went behind the shed. Lyons took Burdine to the hospital where he was treated for nine broken ribs and facial fractures around his eye and other parts of his face.

Jones testified at trial about a different sequence of events. He testified that he had been moving due to his house being in foreclosure. He had been

moving for three days and Burdine wanted to help on the fourth day, so Jones picked him up. Jones believed that Burdine did not have a license. Jones rented a U-Haul that had to be returned that evening. Jones testified that Burdine was not doing much work and kept getting aggravated that Jones was leaving him out of conversations and not talking to him while he was trying to work. At some point, Burdine demanded to be paid $20 and driven home.

Jones made it clear that he intended to pay him, but that he did not have change – he only had six one-dollar bills and a few $100 bills. Burdine wanted $100. Jones said, "What do you want to do, fight?" and it was agreed that it was what Burdine wanted. Jones took his coat off and scraped a line in the dirt and said, "Come on across that line, let's get this over with." But Burdine backed down and did not want to fight. Jones suggested that they get back to work. Burdine got upset that Jones did not pay him and started banging on a wooden post with the hammer. Burdine said he would hold on to the hammer until he was paid. When Jones took the hammer away from him, Burdine used his elbow to hit Jones in the head. The two wrestled over the hammer until Burdine pushed Jones, causing him to fall into a bunch of briars. Jones feared that if Burdine got to the hammer he would be dead.

While Burdine was on top of Jones, Jones asked what was wrong with him. Burdine repeatedly stated he wanted to get paid. According to Jones, Burdine slung the hammer somewhere and told Jones "I could have killed you." Jones agreed and tried to get back to work. Jones walked to Burdine, grabbed him and tried to lead him off the property. Burdine told Jones to get

4

his hands off him and threw his elbow to the left of Jones's head, hitting him. Burdine stuck his fists up. Jones testified that he hit him three times as a natural defense because Burdine hit him first. Burdine went to the ground and Jones fell on top of him. Burdine tried calling him a son of a bitch, but before he could get it out Jones grabbed him by the throat. Jones had one knee on his chest and the other on his arm.

Jones told Burdine that once he got off of him Burdine needed to leave the property. Jones walked over to the shed, and around the same time, Burdine's ride arrived and he left. Jones finished loading the moving truck and waited for his cousin to return the truck to where he rented it. It was cold, so he waited in his truck. He stated that he did not leave the property between the time Burdine left and when police arrived. He testified that he never hit anyone with the hammer and was not sure what happened to the hammer.

At the close of evidence, the trial court granted directed verdicts on the resisting arrest charge and the six counts of third-degree criminal mischief. The only evidence of resisting arrest was Jones moving his hands off the car, which the trial court determined was insufficient. Additionally, while some of the troopers testified about ripping their pants while walking through briars in search of Jones, Jones did nothing to cause any damage to the troopers' pants.

The jury found Jones not guilty of tampering with evidence for allegedly trying to hide the hammer but convicted Jones of second-degree assault and of being a first-degree PFO. The jury recommended a five-year prison sentence

5

enhanced to twenty years by virtue of the PFO conviction and the trial court sentenced Jones in accordance with the jury's recommendation.

## ANALYSIS

Jones now appeals as a matter of right, raising four allegations of error: (1) the trial court erred by not instructing the jury on extreme emotional disturbance; (2) the trial court erred by not excluding evidence of Jones's alleged arson and smoking a glass pipe on the night in question; (3) the Commonwealth placed undue pressure on the jury to convict him; and (4) the prosecutor engaged in misconduct.

### I. Jones was not entitled to an extreme emotional disturbance instruction.

Under Kentucky Revised Statute (KRS) 508.040, when a first- or second-degree assault pursuant to KRS 508.020 is committed under EED, it is mitigated to a Class D felony. KRS 508.040 states that

> [i]n any prosecution under KRS 508.010, 508.020 or 508.030 in which intentionally causing physical injury or serious physical injury is an element of the offense, the defendant may establish in mitigation that he acted under the influence of extreme emotional disturbance, as defined in subsection (1)(a) of KRS 507.020.

KRS 507.020(1)(a) references acting

> under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse, the reasonableness of which is to be determined from the viewpoint of a person in the defendant's situation under the circumstances as the defendant believed them to be.

The jury was instructed on self-protection and first-, second- and fourth-degree assault with a hammer, and second- and fourth-degree assault with his

6

fists. The jury found Jones guilty of second-degree assault with use of his fists. Second-degree assault is a Class C felony and the jury sentenced Jones to five years for the assault, but enhanced his sentence to twenty years for being a first-degree PFO. Because of the enhancement, the jury could have imposed a sentence ranging from ten to twenty years. If the trial court had instructed the jury on assault under EED, and the jury found him guilty under such instruction, it would have constituted a Class D felony. KRS 508.040(2)(a). But since the jury also found Jones to be a first-degree PFO, the jury still would have considered a sentence ranging from ten to twenty years, as the PFO enhancements are the same for both Class C and D felonies. KRS 532.080(6)(b). So we note from the outset that the sentencing options would not have differed even if the EED instruction had been given.

Turning to Jones's EED argument, Burdine testified at trial that Jones is usually a nice guy, and that on the night of the assault he "flipped a switch" and went from "daylight to dark." Jones requested an EED instruction for the assault charge but the trial court denied the request, finding insufficient evidence that Jones acted under EED. Specifically, the trial court noted that the testimony from Jones, Burdine and Spurling indicated that there were several "dust ups" between Jones and Burdine, but that they made peace with each other right up until the assault. Jones counters that he was entitled to an EED instruction because he was provoked by Burdine "accusing him of

7

burning down his own house,"[1] and that sudden and uninterrupted provocation immediately preceded the assault.

"When the question is whether a trial court erred by . . . not giving an instruction that was required by the evidence; the appropriate standard for appellate review is whether the trial court abused its discretion." *Sargent v. Shaffer*, 467 S.W.3d 198, 203 (Ky. 2015). A trial court abuses its discretion when its ruling is "arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky. 1999).

EED has been defined by this Court as follows:

> Extreme emotional disturbance is a temporary state of mind so enraged, inflamed, or disturbed as to overcome one's judgment, and to cause one to act uncontrollably from the impelling force of the extreme emotional disturbance rather than from evil or malicious purposes. It is not a mental disease in itself, and an enraged, inflamed, or disturbed emotional state does not constitute an extreme emotional disturbance unless there is a reasonable explanation or excuse therefor, the reasonableness of which is to be determined from the viewpoint of a person in the defendant's situation under circumstances as defendant believed them to be.

*McClellan v. Commonwealth*, 715 S.W.2d 464, 468-69 (Ky. 1986).

To be entitled to an EED instruction, the evidence had to reflect a sudden and uninterrupted triggering event, that Jones was extremely emotionally disturbed as a result, and that he acted under the influence of that disturbance. The reasonableness of a claim of EED is evaluated subjectively from the defendant's point of view. *Holland v. Commonwealth*, 466 S.W.3d

---

[1] As we note throughout this opinion, no one testified that Burdine ever made that accusation. He simply referred to the "burnt out" house as a landmark when giving his wife directions on where to pick him up.

8

493, 503 (Ky. 2015) (citing *Spears v. Commonwealth*, 30 S.W.3d 152, 154 (Ky. 2000)).

Jones testified that Burdine was standing by a post with Jones's hammer and was beating the post with the hammer every time Jones walked past him. This scared Jones because Burdine was giving him a hateful and spiteful look. Jones stated that he felt threatened and told Burdine to put the hammer down, but Burdine refused. Jones reached for the hammer and took it from Burdine, bumping into his head. He stated that Burdine came at him, trying to get the hammer. Jones feared getting hurt. He testified that Burdine pushed him back into a bunch of briars and Jones feared that if Burdine got to the hammer he would kill him. Once the two men got up, Burdine told Jones he could have killed him if he wanted.

Jones testified that Burdine repeatedly cursed at him. Burdine elbowed Jones in the side of the head, trying to get him off him. Jones said he then hit Burdine three times in defense. Burdine tried calling Jones a son of a bitch, but before he could get it out Burdine went to the ground, and Jones was on top of him. Jones testified that he was mad. He grabbed Burdine by the throat and had one knee on his chest, the other on his arm. Jones told Burdine, "You just think son of a bitch one more time, I swear to God I'm going to beat you to death." Jones testified that he again told Burdine he needed to leave, and then got up. Jones's testimony reflected that he felt scared and threatened by Burdine.

9

On cross-examination, Jones testified that he was mad and that Burdine "pushed him too far." The only other testimony that would support an EED instruction came from Burdine who testified that Jones "turned from daylight to dark" and that he was the nicest guy any other time. Although Jones testified that he was mad, most of his statements suggested fear. Regardless of whether fear can support an EED instruction, we conclude the evidence here did not rise to the level of an extreme emotional disturbance.

Jones's testimony primarily supported a self-defense theory, a theory reflected in the jury instructions. Of course, a trial court must instruct the jury on the whole law of the case, meaning it must give "instructions applicable to every state of the case deducible or supported to any extent by the testimony." *Keeling v. Commonwealth*, 381 S.W.3d 248, 264 (Ky. 2012). Self-defense and extreme emotional disturbance are not mutually exclusive defenses. "Self-protection and emotional disturbance are separate defenses and the presence of the former does not automatically trigger the latter, although under certain circumstances and with certain evidence, both might well be justified." *Carwile v. Commonwealth*, 656 S.W.2d 722, 723 (Ky. 1983). While a trial court may properly instruct on both self-protection and EED, it was not warranted in this case. The events described by the witnesses reflected continuing arguments and physical altercations between the two men but not that Jones suffered from an enraged, inflamed temporary state of mind that caused him "to act uncontrollably from the impelling force" of an EED.

10

As for Burdine's description of the "burnt out" house being a triggering event, Tara Lyons, Burdine's wife, testified that while she was on the phone with Burdine he said he was "at the burnt-out house that Jones owns." She also said that Burdine described that "You'll see the U-Haul, and it's the burnt-out house before you get to Jeff's." After her testimony, a state trooper who was involved in the investigation testified that in attempting to find where Jones was, he called Lyons and asked to speak with Burdine. The trooper went to Jones's residence, but he was not there. Still unsure as to where the assault took place, the trooper asked a neighbor, who pointed to a location in which there was an "old burned down house." The last bit of testimony pertaining to the burnt house came from Jones himself. When asked what is at 840 Maple Road, he stated that "There used to be a rental house there, and it got burnt down . . . I don't remember what year it was."

Based on all the testimony, there is no indication that Burdine ever accused Jones of committing arson by burning down the house. Burdine simply used the burnt house as a landmark in attempting to describe his location to his wife and to the trooper. None of the witnesses alleged that Jones burned the house or testified that he had been otherwise accused of that act. While we agree with Jones that an allegation of arson might trigger an extreme emotional disturbance in the proper circumstances, the testimony in this case was entirely insufficient to warrant an EED instruction on that basis, even when viewing the evidence in a light most favorable to Jones.

11

Additionally, as the trial court stated, the two men scuffled several times prior to the assault over payment.[2] Each time the men got into altercations, there seemed to be evidence of reconciliation or time in which Jones could have "cooled off." Jones testified that Burdine became aggravated over payment, and Jones asked him if he wanted to fight. Jones said, "Let's get this over with." This statement shows that Jones contemplated a physical altercation with Burdine even *before* Burdine made the comment about the burnt house. In Burdine's version of events, after the initial altercation, which occurred when Burdine called his wife and used the burnt house as a landmark to get to his location, he stated that Jones apologized to him. The two apparently made amends. Additionally, Spurling, the third man present, told a trooper that he saw Jones and Burdine arguing over the hammer on the ground for a short period of time, but then they helped each other up and even drank a beer and smoked a cigarette together.

Jones did testify regarding his state of mind, indicating that he was scared of Burdine, concerned about getting hurt with the hammer, and that he felt threatened. On cross-examination Jones said he was mad and that Burdine pushed him too far. However, none of this testimony elicited at trial rises to the level of proving that Jones suffered from an "enraged, inflamed, or

---

[2] According to Burdine's testimony, he and Jones scuffled once prior to the assault. Jones believed Burdine told his wife that he committed arson and Jones approached Burdine with a hammer, which the two scuffled over. Then the assault occurred when Burdine called his wife a second time. According to Jones, there were two scuffles prior to the assault – the first attempt to fight indicated by Jones drawing a line in the dirt, a second scuffle over the hammer, then the assault.

12

disturbed" state of mind, *McClellan*, 715 S.W.2d at 468, and that an extreme emotional disturbance overcame his judgment. Evidence of "mere hurt or anger" is simply insufficient to warrant an EED instruction. *Talbott v. Commonwealth*, 968 S.W.2d 76, 85 (Ky. 1998) (citing *Thompson v. Commonwealth*, 862 S.W.2d 871 (Ky. 1993)).

The evidence surrounding Jones's assault of Burdine was conflicting but none of the accounts would justify instructing the jury on the defense of extreme emotional disturbance. After careful consideration, we conclude the trial court did not abuse its discretion by declining to give an EED instruction.

## II. No reversible error occurred in the admission of KRE 404(b) evidence.

Approximately a week and a half prior to trial the Commonwealth filed notice of its intent to introduce evidence under KRE 404(b). The Commonwealth sought to introduce evidence that immediately prior to the assault, Jones told Burdine he better not tell anyone that Jones burned his own house down. The Commonwealth posited that for some reason Jones clearly thought Burdine was telling people that he had committed a crime and therefore was angry with Burdine. Additionally, the notice stated that Burdine would testify that Jones was smoking a small glass pipe on the day in question. The trial court conducted a hearing, and Jones objected to the introduction of the KRE 404(b) evidence. Jones argued that the notice was untimely because it was so close to trial and he needed time to investigate the circumstances surrounding the burnt house. Defense counsel also stated that Burdine never mentioned how the house burned or who was responsible, he simply referenced

13

the burnt house when describing his location. Finally, defense counsel argued that introduction of testimony about the burnt house or the glass pipe would be unduly prejudicial to Jones and confuse the jury.

The trial court determined that the intended testimony about the house would merely be a recital of statements Jones made in a conversation that took place between Jones and his victim. The trial court noted that Jones would be able to challenge the testimony on cross-examination by highlighting that Burdine did not disclose this information earlier and never mentioned it in his initial statements to police. Ultimately the trial court determined that the comment about the burnt house could have been the motive for the assault, and that the testimony was inextricably intertwined with the assault. Further, the trial court ruled that the prejudicial effect of the testimony did not outweigh its probative value. Jones argues that the trial court erred in allowing the testimony but we find no abuse of discretion.

As to the alleged drug use, the trial court stated that it did not need to decide the issue prior to trial. In its handwritten ruling, the trial court stated it would address testimony of alleged drug use at trial because it needed to determine whether the Commonwealth laid a proper foundation. Notably, while Jones objected to this testimony prior to trial, he did not object during Burdine's testimony. We review a trial court's decision on admitting evidence for an abuse of discretion. *Clark v. Commonwealth*, 223 S.W.3d 90, 95 (Ky. 2007). A trial court abuses its discretion when its ruling is "arbitrary,

14

unreasonable, unfair, or unsupported by sound legal principles." *English*, 993 S.W.2d at 945.

KRE 404(b) states:

(b) Other crimes, wrongs, or acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible:

(1) If offered for some other purpose, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident; or

(2) If so inextricably intertwined with other evidence essential to the case that separation of the two (2) could not be accomplished without serious adverse effect on the offering party.

This rule is "exclusionary in nature." *Bell v. Commonwealth*, 875 S.W.2d 882, 889 (Ky. 1994). We address Jones's argument regarding KRE 404(b) and the alleged arson and drug use separately.

While Jones classifies the testimony regarding the burnt house as an allegation that he committed arson, it hardly amounts to such. Burdine testified that he gave his wife directions to get to his location, and he stated, "I'm at the house before you get to Jeff's . . . the burnt down house before you get to Jeff's other house." Jones apparently interpreted this statement as an allegation of arson and threatened Burdine that he must never tell anyone that he burned the house down. Burdine further testified that he never said Jones burnt the house down, he was merely describing his location to his wife. Burdine testified that Jones was angry after Burdine made the comment to his

wife, which supports the trial court's reasoning that this evidence was offered to show a potential motive for the assault.

In addition, Lyons and one of the troopers testified about the burnt house, but both merely referred to it as a landmark and did not use it to allege that Jones committed arson. We agree with the trial court that the testimony was inextricably intertwined with the assault because it was part of the larger scheme of disagreements and scuffles between Burdine and Jones on the day in question. Burdine testified that the first scuffle with Jones happened after Burdine used the burnt house as a landmark while on the phone with his wife. Therefore KRE 404(b)(1) and (2) were both satisfied, rendering the evidence admissible and the trial court's ruling proper.

Jones also argues that the trial court erred in allowing Burdine to testify that Jones was smoking from a glass pipe before the assault. To determine the admissibility of evidence under KRE 404(b), this Court must consider relevance, probative value and prejudice. *Bell*, 875 S.W.2d at 889-91. "[T]he burden lies with the prosecution to provide an alternate base for admission of the evidence apart from its propensity relevance." *Anderson v. Commonwealth*, 231 S.W.3d 117, 120 (Ky. 2007). Here, the Commonwealth did not lay a proper foundation for the evidence. The prosecutor questioned Burdine about additional information he gave the police a few weeks prior to trial, and he stated that he told them about the arson comment prior to the assault and seeing Jones smoking a glass pipe. The Commonwealth did not establish an alternative reason for introducing the testimony under KRE 404(b)(1) and never

16

suggested that the alleged pipe smoking was related to the assault. Additionally, under KRE 404(b)(2), it was not "inextricably intertwined with other evidence *essential to the case* . . . ." (emphasis added). Therefore, the trial court erred in admitting such testimony.

However, we conclude that this error was harmless. "A non-constitutional evidentiary error may be deemed harmless . . . if the reviewing court can say with fair assurance that the judgment was not substantially swayed by the error." *Winstead v. Commonwealth*, 283 S.W.3d 678, 688-89 (Ky. 2009) (citing *Kotteakos v. United States*, 328 U.S. 750 (1946)). Here we can say "with fair assurance" that the mere mention of Jones's smoking a glass pipe did not substantially sway the jury's judgment on the charges and defenses presented.

At trial, Burdine testified that right before the assault he saw Jones smoking a glass pipe. Burdine did not speculate as to what was in the pipe, and only stated that Jones did not smoke marijuana and he was not smoking tobacco. That was the only mention of drug use. While Jones points to two potential jurors who expressed reservations regarding drug use neither of those venire panel members sat on the jury in Jones's case, rendering their reservations immaterial. Jones was able to question the credibility and accuracy of Burdine's testimony on cross-examination, especially noting that Burdine's first mention of the glass pipe occurred just a few weeks before trial. In sum, while the admission of the glass pipe testimony was error, it was harmless error.

17

### III. The Commonwealth did not place undue pressure on the jury to convict.

During closing argument in the guilt phase of the trial, the Commonwealth told the jury that the judge and police officers do not enforce the law and that only the jury could enforce the law against Jones. Defense counsel objected to these statements and argued that the Commonwealth was giving a "send a message" closing argument. The Commonwealth responded that it referred to Jones specifically throughout its explanation about enforcing the law, making it clear the jury should apply the law to the evidence presented. The trial court overruled the objection. Jones now argues that he is entitled to a new trial because of the Commonwealth's improper pressure on the jury to convict.

On a claim of prosecutorial misconduct, "[w]e will reverse . . . only if the misconduct was 'flagrant' or if we find all of the following to be true: (1) the proof of guilt is not overwhelming, (2) a contemporaneous objection was made, and (3) the trial court failed to cure the misconduct with a sufficient admonition." *Dickerson v. Commonwealth*, 485 S.W.3d 310, 329 (Ky. 2016). "In reviewing such claims, we must always consider these closing arguments as a whole and keep in mind the wide latitude we allow parties during closing arguments." *Id.* at 331 (citations omitted).

Jones claims that the Commonwealth placed undue community pressure on the jury. In *Cantrell v. Commonwealth*, 288 S.W.3d 291, 297-98 (Ky. 2009), during the penalty phase the prosecutor essentially highlighted the dangers methamphetamine poses to communities and urged the jury to impose the

18

maximum sentence on a defendant charged with various drug charges. This Court reasoned that "so long as the jury is well aware that it is sentencing the particular defendant before it—with his or her good points and bad—on the crime for which he or she has been convicted, there is no prejudice in the prosecutor commenting on the deterrent effect of that sentence." *Id.* at 299. Additionally, "[a]ny effort by the prosecutor in his closing argument to shame jurors or attempt to put community pressure on jurors' decisions is strictly prohibited." *Id.* The Court also reiterated its disapproval of "send a message" arguments during the guilt phase. *Id.*

While *Cantrell* specifically addressed closing arguments in which the prosecutor places undue community pressure on the jury during the penalty phase, the same reasoning arguably can apply to Jones's allegation of misconduct at the guilt phase. However, the prosecutor specifically referred to Jones with each statement she made about the various roles that the judge, police and jury play in our law enforcement system. She did not place undue pressure on the jury to find Jones guilty based on their duty as jurors in the community, but rather implored them to enforce the law as to Jones's conduct. "Enforcing the law" would require the jury to apply the law as instructed to them to the evidence presented at trial, which is precisely the jury's role.

This case resembles *Slaughter v. Commonwealth*, 744 S.W.2d 407, 412 (Ky. 1987), where in closing argument a prosecutor stated, "He had done all he could do, that the police had done all they could do, that the judge had been fair and impartial, and . . . now it's going to come your time to deal with justice

19

in this particular case." This Court, citing past decisions, reasoned that a prosecutor can ask the jury "not to 'let the officer down,'" or call on the jury to do its duty. *Id.* Accordingly, the prosecutor's statements were deemed proper. *Id.*

Similar to telling the jury in *Slaughter* to "deal with justice" in that case, the prosecutor here told the jury to enforce the law as to Jones. This is simply telling the jury to perform its duty or do its job. The prosecutor's argument was clearly about enforcing the law as it pertains to Jones, not sending a message to the larger community about crime in general, a practice we have condemned. The prosecutor's conduct was not misconduct and thus cannot possibly satisfy the standard for reversal on prosecutorial misconduct grounds as established in *Dickerson*, 485 S.W.3d at 329.

## IV. There was no prosecutorial misconduct that justifies a new trial.

Jones also argues that several instances of prosecutorial misconduct occurring throughout his case warrant a new trial. First, he notes the prosecutor proceeded to trial on six counts of criminal mischief, blaming Jones for six troopers' ripped pants, but only called two troopers to testify about their damaged clothing. Second, he argues that the prosecutor improperly tilted the scales against him and attacked him by using his ex-wife's medical emergency (she was discovered by troopers that night in a nearby trailer in diabetic shock) to highlight that he hid after the assault and that his behavior suggested consciousness of guilt. Third, Jones reiterates, incorrectly as we have found, that the prosecutor gave an improper closing argument because he urged the

jury to "send a message." Lastly, Jones again argues that the prosecutor improperly commented on the alleged arson and glass pipe.

Apart from the third argument, these allegations of prosecutorial misconduct are unpreserved. Jones states that his fourth argument regarding the alleged arson and glass pipe is preserved by his objection to the admission of that evidence as KRE 404(b) evidence, but we disagree. Jones only objected to this testimony in a pre-trial hearing. He only objected once during the Commonwealth's closing, and it was during what he argues was the "send a message" portion of the closing argument. We review the three unpreserved allegations "for palpable error, reversing a conviction based on prosecutorial misconduct during closing argument only if that misconduct was flagrant." *Lewis v. Commonwealth*, 475 S.W.3d 26, 37 (Ky. 2015).

As for the criminal mischief counts, the trial court granted a directed verdict on each of those counts. Jones argues that it was misleading for the prosecutor to tell the jury that Jones was indicted on six counts of criminal mischief with no proof. However, Jones was indicted on those six charges, so the prosecutor's statement was true. Because it was true, this statement could not have misled the jury, and certainly was not flagrant misconduct that amounts to palpable error. And although it should be obvious, we note that without more, the fact that charges are dismissed on a directed verdict motion does not translate into prosecutorial misconduct.

After Burdine's wife called the police to report the assault, Kentucky State Police troopers responded to the scene and attempted to locate Jones.

21

When no one answered the door, the troopers noticed a trailer parked on the property. Upon approaching the trailer, they found an unresponsive female, later revealed to be Jones's ex-wife. During closing argument, the prosecutor revealed that she was experiencing a diabetic emergency. The troopers called EMS and once they arrived, the troopers left to continue searching for Jones. Spurling testified that after the emergency vehicle arrived its lights were visible from where they were sitting and that they watched the troopers and the ambulance. Despite seeing the ambulance, Jones remained in his truck parked in the middle of a briar patch. The prosecutor insinuated that Jones was conscious of his guilt and thus continued his attempts to avoid detection despite his ex-wife's medical emergency.

Jones argues that the prosecutor tried to use his ex-wife's diabetic emergency to prejudice the jury against him but his argument is not well-founded. The prosecutor did not state or infer in any way that Jones was responsible for the medical emergency. "Attorneys are allowed great latitude in their closing arguments . . . . However, they may not argue facts that are not in evidence or reasonably inferable from the evidence." *Garrett v. Commonwealth*, 48 S.W.3d 6, 16 (Ky. 2001) (citations omitted). The prosecutor's statements about the visible emergency vehicles and Jones's decision to remain in the briar patch despite the medical emergency were fully supported by the record. This evidence supports a reasonable inference that Jones was intent on avoiding detection by law enforcement, and the prosecutor's statements referencing the ex-wife's medical emergency were

22

simply commentary on that properly admitted evidence, not prosecutorial misconduct.

The third alleged instance of prosecutorial misconduct is based on what Jones has characterized as a "send a message" argument in the guilt phase of the trial. As discussed, the prosecutor's closing argument which included statements about the jury enforcing the law against Jones was proper. A proper closing argument does not equate with prosecutorial misconduct.

Finally, we have determined that admission of the glass pipe testimony was error but harmless. In her closing argument, the prosecutor referenced Burdine's testimony and mentioned that Burdine saw Jones smoking something before he "turned from daylight to dark." In reviewing allegations of prosecutorial misconduct during closing argument, we must consider the closing argument as a whole. *Dickerson*, 485 S.W.3d at 331. The prosecutor's closing argument lasted nearly forty minutes and this single isolated comment regarding evidence that was admitted in the record, albeit erroneously, did not constitute flagrant misconduct. No palpable error occurred.

## CONCLUSION

For the foregoing reasons, we affirm the judgment of the Marion Circuit Court.

All sitting. All concur.

COUNSEL FOR APPELLANT:

Robert Chung-Hua Yang
Assistant Public Advocate


COUNSEL FOR APPELLEE:

Daniel Jay Cameron
Attorney General of Kentucky

James Patrick Judge
Assistant Attorney General