# IMPORTANT NOTICE
## NOT TO BE PUBLISHED OPINION

THIS OPINION IS DESIGNATED "NOT TO BE PUBLISHED." PURSUANT TO THE RULES OF CIVIL PROCEDURE PROMULGATED BY THE SUPREME COURT, RAP 40(D), THIS OPINION IS NOT TO BE PUBLISHED AND SHALL NOT BE CITED OR USED AS BINDING PRECEDENT IN ANY OTHER CASE IN ANY COURT OF THIS STATE; HOWEVER, UNPUBLISHED KENTUCKY APPELLATE DECISIONS, RENDERED AFTER JANUARY 1, 2003, MAY BE CITED FOR CONSIDERATION BY THE COURT IF THERE IS NO PUBLISHED OPINION THAT WOULD ADEQUATELY ADDRESS THE ISSUE BEFORE THE COURT. OPINIONS CITED FOR CONSIDERATION BY THE COURT SHALL BE SET OUT AS AN UNPUBLISHED DECISION IN THE FILED DOCUMENT AND A COPY OF THE ENTIRE DECISION SHALL BE TENDERED ALONG WITH THE DOCUMENT TO THE COURT AND ALL PARTIES TO THE ACTION.

RENDERED: APRIL 27, 2023
NOT TO BE PUBLISHED

# Supreme Court of Kentucky

2021-SC-0538-MR

SHAKKORY WILLIS                                                 APPELLANT

             ON APPEAL FROM CHRISTIAN CIRCUIT COURT
V.                 HONORABLE JOHN L. ATKINS, JUDGE
                     NO. 19-CR-00210

COMMONWEALTH OF KENTUCKY                         APPELLEE

**MEMORANDUM OPINION OF THE COURT**

**<u>AFFIRMING</u>**

Shakkory Willis appeals as a matter of right[1] from the Christian Circuit Court judgment sentencing him to thirty-three (33) years' imprisonment for his convictions of first-degree robbery, first-degree burglary, and second-degree unlawful transaction with a minor. On appeal, Willis alleges certain errors during his trial warrant reversing his conviction. For the following reasons, we affirm.

## I. Factual and Procedural Background

Willis's convictions stem from a coordinated break-in and looting that resulted in injuries to Dylan Stewart and the death of Coryvon Thomas.

---

[1] KY. CONST. § 110(2)(b).

Evidence presented at trial showed that a criminal plan was hatched between Willis, Jimmy Yates, and Lane Carter, with the help of three juveniles: Tia Ochs, Madison Wilson, and Korey Zivotin. The plan was to "hit a lick" (*i.e.,* rob a person or house) at a Hopkinsville residence, where Stewart and Thomas lived and sold marijuana. Ochs and Wilson were directed to go in the house first to buy a little marijuana and scope the place out to see if anything was worth stealing.

On the night of January 23, 2019, Carter drove Ochs and Wilson to the victims' house, with Willis, Yates and Zivotin also in the car. Upon entering the house, Ochs and Wilson went to the back room with the victims to talk, smoke weed, and listen to music. About an hour later, Willis, Yates and Zivotin entered the house. Willis barged into the back room, kicking open the door, and began fighting with Thomas, hitting him with a pistol. Yates was beating up Stewart in the hallway. Ochs and Wilson fled to the car, where Carter was waiting. Yates followed, with shots being fired as he was running to the car. Stewart was shot in the leg and Thomas was killed. Stewart survived his wounds but subsequently died in an unrelated incident prior to trial.

After the shots were fired, Willis and Zivotin ran out of the house and jumped in Carter's car. Carter drove everyone back to Yates's house. Willis then fled to Tennessee, but later surrendered himself to the police after learning that they were looking for him. At the crime scene, police discovered shell casings from two handguns: a .45 caliber and a 9mm. The police

questioned Ochs and Wilson, who outlined their participation and provided names of others involved. They identified "Ceno" which is Willis's nickname.

At trial, Detective Robert Flick with the Hopkinsville Police Department and the Drug Enforcement Administration ("DEA") task force testified about the cellphone records he downloaded from Yates's phone which showed that on January 23 and 24, Yates had multiple calls to and from a contact saved as "Ceno." Detective Randall Greene of the Hopkinsville Police Department testified about his interview with Willis, who acknowledged his nickname was "Ceno" and about the cell-tower data retrieved from Willis's cellphone which showed it pinging in Hopkinsville the night of the crime.

All those implicated in the crime entered into a plea agreement with the Commonwealth and testified at trial except Zivotin, who refused to testify (but who was in jail). The Commonwealth's case against Willis revolved primarily around the testimony of these witnesses, with some corroborating evidence from Yates's and Willis's cellphones. No forensic or DNA evidence connected Willis, or anyone else, to the crime. At the conclusion of the trial, the jury was hung on to the murder charge, but convicted Willis of first-degree robbery, first-degree burglary, and second-degree unlawful transaction with a minor. The trial court imposed the jury's recommended sentence of 33 years. Willis now appeals.

## II. Analysis

Willis alleges numerous errors in the trial court's handling of his case, most of them unpreserved. We will address each in turn, under the applicable standard of review.

### A. No palpable error resulted from Det. Flick's testimony about Yates's cellphone records and Det. Greene's testimony about cell-tower data.

Willis claims that error resulted from Det. Flick's testimony about Yates's cellphone records showing calls to and from "Ceno" the day of, and after, the crime and Det. Greene's testimony about cell-tower data that showed Willis's phone pinging in Hopkinsville on the night of the crime. He presents numerous, overlapping reasons in arguing that these detectives should not have been allowed to testify as they did, none of which are preserved. As a result, we review his claims for palpable error only.

RCr[2] 10.26 provides that

[a] palpable error which affects the substantial rights of a party may be considered by the court on motion for a new trial or by an appellate court on appeal, even though insufficiently raised or preserved for review, and appropriate relief may be granted upon a determination that manifest injustice has resulted from the error.

"To discover manifest injustice, a reviewing court must plumb the depths of the proceeding . . . to determine whether the defect in the proceeding was shocking or jurisprudentially intolerable." *Martin v. Commonwealth*, 207 S.W.3d 1, 4 (Ky. 2006). In other words, the defect must be "so egregious that it

---

[2] Kentucky Rules of Criminal Procedure.

4

jumps off the page . . . and cries out for relief." *Davis v. Commonwealth*, 620 S.W.3d 16, 30 (Ky. 2021) (citation omitted).

Det. Flick testified that he was trained to download information from cellphones and had downloaded Yates's cellphone data in this case. The data he extracted showed multiple phone calls to and from "Ceno" on January 23 and 24. From the report generated by the download, Det. Flick read the dates, times, and duration of seven calls on Yates's phone to and from "Ceno" on January 23 and 24. Det. Flick's entire testimony, including cross examination, lasted four minutes. He did not testify that he had connected the phone number of "Ceno" as belonging to anyone, including Willis, nor did he testify about the content or substance of any phone call.

Willis challenges Det. Flick's testimony on numerous grounds. He argues that (1) the cellphone records were not properly authenticated under KRE[3] 901, (2) Det. Flick was never qualified as an expert under KRE 702, (3) Det. Flick's testimony was hearsay under KRE 802, (4) insufficient corroborating evidence connected the calls to Willis, and (5) Det. Flick's testimony violated the best evidence rule under KRE 1001(1).

Authentication is "a condition precedent to admissibility" and is "satisfied by evidence sufficient to support a finding that the matter in question is what the proponent claims." KRE 901(a). A piece of evidence can be authenticated with the "testimony of witness with knowledge." KRE 901(b). Generally, "the

---

[3] Kentucky Rules of Evidence.

foundational authenticity of a writing can be laid simply by the testimony of someone personally familiar with the writing or by the contents and characteristics of the writing itself." *Brafman v. Commonwealth*, 612 S.W.3d 850, 866 (Ky. 2020). "The burden on the proponent of authentication is slight; only a prima facie showing of authenticity is required." *Hall v. Commonwealth*, 468 S.W.3d 814, 831 (Ky. 2015) (quoting *Sanders v. Commonwealth*, 301 S.W.3d 497, 501 (Ky. 2010)).

In this case, the Commonwealth did not seek to have either Det. Flick or Det. Greene qualified to testify as an expert witness pursuant to KRE 702. For the admission of non-expert, lay witness testimony, KRE 602 requires that a witness have "personal knowledge of the matter" being testified to. This requirement has been interpreted generously: "testimony should not be excluded for lack of personal knowledge unless no reasonable juror could believe that the witness had the ability and opportunity to perceive the event that he testifies about." *United States v. Hickey*, 917 F.2d 901, 904 (6th Cir. 1990) (discussing FRE 602, which is virtually identical to KRE 602). As such, the "threshold of Rule 602 is low." *Id.*

A non-expert witness may make opinions or inferences that are "(a) Rationally based on the perception of the witness; (b) Helpful to a clear understanding of the witness' testimony or the determination of a fact in issue; and (c) Not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." KRE 701.

6

Willis does not argue that Yates's cellphone records were not what they purported to be; instead, he challenges Det. Flick's credentials to authenticate them. However, Det. Flick testified about his employment as a Narcotics Detective with the Hopkinsville Police Department and as a task force officer with the DEA. He stated that he was trained to download data from a cellphone, and that he downloaded that data from Yates's cellphone in this case, which generated a report of the phone's call history, including the dates, times, and duration of calls on January 23 and 24. Det. Flick did not testify as to the content or substance of any phone call or text message.

In arguing that Det. Flick did not properly authenticate the cellphone records, Willis cites to *Baker v. Commonwealth* in support, but in *Baker* the Court held that the call logs police obtained from a cellphone carrier in response to a subpoena were not certified by the custodian of the record (the cellphone provider) as required by KRE 902(11) and therefore were not self-authenticating and constituted inadmissible hearsay. 545 S.W.3d 267, 275 (Ky. 2018). Unlike the police in *Baker,* Det. Flick himself downloaded the data from Yates's phone and thus possessed personal knowledge sufficient to authenticate them. Moreover, his testimony was helpful to jury's understanding of the case as the call history served as corroborating evidence that "Ceno" knew Yates and was in continuous contact with him around the time of the crime.

Willis further maintains that Det. Flick's testimony about the information gleaned from the generated report amounted to scientific or technical

7

knowledge for which expert qualification was required pursuant to KRE 702. Willis cites no authority in support of this assertion. Det. Flick was not presented as an expert witness. His testimony shows he had professional training in downloading information of this type and personal knowledge sufficient to authenticate the generated reports, which we note were not admitted into evidence or published to the jury.

Even if properly authenticated, Willis maintains the phone records were inadmissible hearsay. *See Matthews v. Commonwealth,* 163 S.W.3d 11, 23 (Ky. 2005) ("[T]he establishment of authenticity of a document does not necessarily mean that the document is admissible because there may be other barriers, e.g., hearsay, to its admission[]"). Hearsay is an out-of-court statement offered into evidence as substantive proof that the matter asserted in the statement is true. KRE 801(c).

The use of cellphone data in criminal prosecutions is becoming more common and the parameters of its admissibility are being defined by the courts. The Commonwealth argues that the phone records fall within KRE 803's "business record exception" to KRE 802's rule against hearsay. That exception exempts from hearsay "records of regularly conducted activity" such as "a memorandum, report, record, or data compilation." KRE 803(6). With regards to authenticating business records, KRE 902(11) provides, in pertinent part:

Business records.

(A) Unless the sources of information or other circumstances indicate lack of trustworthiness, the original or a duplicate of a

8

> record of regularly conducted activity within the scope of KRE 803(6) or KRE 803(7), which the custodian thereof certifies:
>
> (i) Was made, at or near the time of the occurrence of the matters set forth, by (or from information transmitted by) a person with knowledge of those matters;
>
> (ii) Is kept in the course of the regularly conducted activity; and
>
> (iii) Was made by the regularly conducted activity as a regular practice.

Business records are "self-authenticating" so long as they satisfy KRE 902(11).

Recently, a federal court in Kentucky addressed the use of cellphone records and cell-tower data in a bank-robbery prosecution, *United States v. Jones*, No. 3:21-CR-89-BJB, 2022 WL 17884450, at *3 (W.D. Ky. Dec. 23, 2022). While the *Jones* court discussed Federal Rules of Evidence ("FRE") 702 and 803, because Kentucky's Rules of Evidence are substantially similar, we find the discussion helpful. The *Jones* court noted that the admission of phone-company records themselves "is typically uncontroversial; if relevant, the records may be admitted consistent with the hearsay rules." *Id.* "And even if such records amounted to statements subject to the hearsay rules, Federal Rule of Evidence 803(6) exempts records made at the time of the call and kept in the course of regularly conducted activity by the cellular provider." *Id.,* at *4 (citing *United States v. Yeley-Davis*, 632 F.3d 673, 678 (10th Cir. 2011)).

The *Jones* court observed that admissible phone records "typically identify the relevant phone number, the name associated with that number and account, the times or durations of calls or text messages, and the location or address of towers that the phone used to transmit specific calls and

9

messages." *Id.* (citing *Carpenter v. United States*, —— U.S. ——, 138 S. Ct. 2206, 2211–12 (2018) (describing regular collection of CSLI [cell site location information] data by phone companies for business purposes)).  As to whether expert witness testimony is required under Rule 702 for the admission of CLSI, that inquiry is fact dependent, and turns on the nature and extent of the witness's proposed testimony.  *See Jones*, 2022 WL 17884450, at *1 ("The law of CSLI, however, remains less settled than the lingo[]").

Willis contends that the phone records were not "business records" but rather were "investigative reports" that fall under KRE 803(8)(A) and should have been excluded from evidence as hearsay.  KRE 803(8) generally excepts public records and reports from the hearsay exclusion, but not "[i]nvestigative reports by police and other law enforcement personnel[.]"  KRE 803(8)(A).  In support, Willis summarily cites to one case, *Skeans v. Commonwealth*, 912 S.W.2d 455 (Ky. App. 1995), which, upon review, we do not find helpful.

In *Baker*, this Court found that the phone records were inadmissible through the business-record exception to the hearsay rule because no custodian of the records (i.e., the cellphone provider) testified.  Here, Det. Flick was the custodian of the records, and the extent of his testimony involved reading the relevant dates, times, and durations of phone calls from the generated report. *See McNeil v. Commonwealth,* 468 S.W.3d 858 (Ky. 2015) (holding that a detective was allowed to use cellphone records to identify the owner of a cellphone number since he did not offer any opinion as to the inferences that may be drawn from the cellphone records).

10

The report generated from Yates's cellphone was not an "investigative report" detailing the findings and conclusions resulting from an investigation. *See, e.g., Jordan v. Commonwealth*, 74 S.W.3d 263 (Ky. 2002) (holding that Cabinet for Human Resources, Department for Social Services investigative form containing a non-witness social worker's determination that an allegation was "substantiated" was inadmissible under KRE 803(8)); *Prater v. Cabinet for Human Res.*, 954 S.W.2d 954 (Ky. 1997) (holding that the recorded opinions and conclusions of an unidentified social worker's "professional determination" that an allegation of abuse is "substantiated" is not admissible and is nothing more than improper opinion testimony); *Engle v. Baptist Healthcare Sys., Inc.*, 336 S.W.3d 116, 118 (Ky. App. 2011) (holding that the Cabinet for Health and Family Services, Department for Community Based Services (DCBS) form was hearsay and not admissible as an investigative report under KRE 803(8) since the author of the report did not testify).

Here, the generated report was simply a printout of Yates's call history and Det. Flick's testimony contained no subjective findings or conclusions. The rule against hearsay concerns "trustworthiness." Here, Willis has completely failed to show that Det. Flick's extraction of the data from Yates's phone and his testimony about the results of his extraction were untrustworthy.

Next, Willis asserts that Yates's cellphone records were inadmissible hearsay because they were offered to prove the truth of the matter asserted. In *Baker*, this Court held that the cellphone records that were not properly

11

authenticated were also inadmissible hearsay to prove the truth of the matter that the calls were made. 545 S.W.3d at 276–77. Nevertheless, that Court held that their admission was harmless error considering the overwhelming evidence against Baker *and* that the call logs served only to show that a number Baker was known to have used called the victim's phone an hour before the murder; the records were not offered as substantive proof that Baker was the killer. *Id.* Likewise, Yates's cellphone records were offered to show that he and Willis/"Ceno" were in continuous contact around the time of the crime, not to prove that Willis intended to rob, burglarize, or murder the victims.

If such error was found to be harmless in *Baker*, it certainly does not rise to the level of palpable error here. As in *Baker*, the evidence of Willis's guilt presented at trial was substantial. Four codefendants testified at trial and all identified Willis as complicit. Ochs testified that Willis kicked down the door in the back of the victims' home, had a gun, and beat Thomas during the course of the robbery and burglary. Likewise, Wilson testified that Willis kicked down the door to the back room and hit Thomas with a pistol. Thomas was found shot in that back room of the house. Carter identified Willis as being involved in the robbery and burglary and stated that he heard gunshots fired in the house while he was waiting outside in the car. Yates testified that Willis was at the house and involved in the crimes that took place.

Willis asserts that insufficient corroborating evidence connected him to the contact named "Ceno" in Yates's phone. However, during his interview with

12

Det. Greene, Willis acknowledged that his nickname was "Ceno." And Ochs, Wilson and Yates all testified at trial that Willis was known as "Ceno." The assessment of the witnesses' credibility and the weight accorded to the testimony (including the fact that Det. Flick was unable to match "Ceno's" number with any account) lies within the purview of the jury. *See Clark v. Commonwealth*, 567 S.W.3d 565, 569–70 (Ky. 2019) ("The jury is instructed to reach its verdict from the evidence; and if there [is] competent and relevant evidence affording a reasonable and logical inference or conclusion of a definite fact, this court will not invade the jury's province to weigh conflicting evidence, judge the credibility of witnesses and draw the ultimate conclusion[]") (internal quotations and citation omitted).

Next, Willis asserts that Det. Flick's testimony runs afoul of the best evidence rule because Yates's physical phone and the generated report should have been introduced into evidence. This argument contradicts Willis's position that the information from the report was inadmissible because not properly authenticated, but we will nonetheless briefly address it. The best evidence rule, KRE 1002, requires that the original of a writing be produced if the proponent seeks to "prove the contents" of the piece of evidence. "[T]he mere existence of a writing that can be used to prove a material fact does not trigger an application of the best evidence rule." Robert G. Lawson, *The Kentucky Evidence Law Handbook*, § 7.20[3][b], at 614 (2020 edition).

Willis cites no legal authority in support of applying the best evidence rule here. Willis does not dispute that the generated report is not what it is

13

purported to be, or that Det. Flick's recitation of the dates, times, and duration of the calls between Yates and "Ceno" was inaccurate or incompetent, or that not introducing the report or phone into evidence amounted to palpable error. Thus, we find this claim unavailing.

Willis also raises concerns about the admissibility of Det. Greene's testimony. He argues that Det. Greene was not qualified to testify as an expert on cell-tower data pursuant to KRE 702 and that he lacked the personal knowledge required to testify under KRE 602. Willis maintains that the inadmissible testimony of Det. Greene was highly prejudicial as it was used by the Commonwealth during closing arguments to controvert Willis's alibi that he was in Oak Grove, not Hopkinsville, the night of the crime.

In *Jones*, the court observed that "[i]n recent decades, historical cell-site location information has become a popular tool for law enforcement officials trying to reconstruct the movements of suspected criminals." 2022 WL 17884450, at *3 (citing *Carpenter*, 138 S. Ct. 2206; *Torrence v. Commonwealth*, 603 S.W.3d 214, 226 (Ky. 2020)). "CSLI can serve as an efficient way to learn about a person's whereabouts in connection with potential criminal activity." 2022 WL 17884450, at *3 (citing *Carpenter*, 138 S. Ct. at 2217–18). Furthermore, "[c]ourts have generally allowed testimony regarding CSLI at trial." 2022 WL 17884450, at *3 (citing *Torrence*, 603 S.W.3d at 226; *United States v. Hill*, 818 F.3d 289, 297 (7th Cir. 2016) ("District courts that have been called upon to decide whether to admit historical cell-site analysis have almost universally done so[]")).

14

In *Torrence v. Commonwealth*, this Court addressed the permissible boundaries of lay witness testimony on historical cell tower data:

> [L]ay testimony may be used to present historical cell-tower data so long as the testimony does not go beyond simply marking coordinates on a map. If the witness seeks to offer an opinion about inferences that may be drawn from that information, that witness must be presented as an expert witness under KRE 702 (for example, if a witness seeks to provide an opinion as to the location of the cell phone during the relevant time based on the plotted coordinates).

603 S.W.3d at 228. The rationale for allowing lay testimony in this manner is that a lay person could use the data to mark locations on a map; this task does not require expert knowledge. *Id.* But for conclusory statements made from interpreting cell-tower data, expert testimony would be required. *Id.*

In *Torrence*, a police officer was allowed to offer lay testimony about AT&T records of locations where the defendant's cellphone interacted with towers around the time of the crime and to mark them on a map. *Id.* at 224. The officer did not opine about the location of the phone, or the defendant, based on that information. *Id.* During closing arguments, the Commonwealth asserted that reasonable inferences could be drawn from the points marked on the map. *Id.* at 226.

As in *Torrence*, Det. Greene's lay testimony about cell-tower data was used to cast doubt on Willis's claimed alibi. Det. Greene's qualifications to offer lay testimony include his employment with the Hopkinsville Police Department for almost 28 years and his position as the senior detective assigned to the Investigative Unit. Det. Greene stated that he had investigated

15

this case but was not brought on until later in the investigation. He testified that police had obtained a search warrant to get the cell-tower data from Willis's cellphone and, while he was unsure of the details, the phone pinged somewhere in Hopkinsville. The Commonwealth asked him if the phone pinged around 5 a.m. in Oak Grove, and the Det. Greene responded, "something like that."

Det. Greene testified about his interview with Willis and how Willis admitted to being with Yates, Carter and two young/underage girls earlier in the day on the date of the crime. During that interview, Willis said he sat in the passenger seat of Carter's car to sell him weed. Willis relayed to Det. Greene a conversation he had with Yates and Carter about "hitting a lick" but said he told them if they were to hit a lick, he would not participate. Det. Greene stated that the two young girls Willis described turned out to be Ochs and Wilson.

Det. Greene asked Willis how he could have been in Oak Grove when his phone was pinging in Hopkinsville. Det. Greene suggested to Willis that maybe he had left his phone in Carter's car when he was sitting in the passenger seat earlier in the day, but Willis denied leaving his phone behind and said he had it with him the entire time. Defense counsel cross-examined Det. Greene and asked whether it was common for people like Willis who sell weed to have two phones and Det. Greene agreed that was. But Det. Greene clarified that Willis denied having two phones. During closing arguments, the Commonwealth

16

used the cell-tower data to infer that Willis was in Hopkinsville the night of the crime and not in Oak Grove, as he claimed to be.

Det. Greene's testimony about Willis's cellphone-tower data was not a conclusory opinion about Willis's whereabouts or his phone's location on the night of the crime, which would require an expert opinion under the parameters set forth in *Torrence.* Nor did Det. Greene identify which cell tower in Hopkinsville Willis's phone pinged to, or wade into areas that we have previously held require expert testimony such as the "granulization theory of cell phone location based on cell tower data[.]" *Torrence,* 603 S.W.3d at 224.

Moreover, Det. Greene satisfied the threshold for possessing the requisite personal knowledge to testify about the cell-tower results yielded by the police's search warrant and his testimony was helpful to the trier of fact. Det. Greene's testimony was not just about Willis's phone and cell-tower data; that exchange, including defense counsel's cross-examination, lasted only four minutes. The remainder of Det. Greene's testimony outlined his interview with Willis and provided the jury with additional corroborating evidence, which assisted them in understanding how the investigation unfolded. In particular, he conveyed Willis's admission to sitting in Carter's car in Hopkinsville the day of the incident, with Carter, Yates, Ochs, and Wilson; Willis's confession to discussing "hitting a lick" with Yates and Carter; Willis's acknowledgement that Ochs and Wilson were young girls/underage; and Willis confirming that his nickname is "Ceno."

17

Willis argues that Det. Greene's testimony was highly prejudicial as it was used by the Commonwealth during closing arguments to place him at the scene when no other physical evidence did: no fingerprints, no blood, no weapon, no shoe prints tied him to the victim's home. However, as Det. Greene testified, no forensic evidence placed any of the participants at the scene. But the confessions of four codefendants did.

Kentucky law is well-settled that counsel is afforded wide latitude when making closing arguments, which includes drawing reasonable inferences from the evidence. *Dickerson v. Commonwealth*, 485 S.W.3d 310, 331 (Ky. 2016). During closing arguments, the prosecutor posed the hypothetical question: why is Willis's phone showing he was in Hopkinsville when he said he was in Oak Grove? The prosecutor noted that Willis denied having two phones, which might have explained this conundrum. And Willis admitted he had his phone on him the whole time. The prosecutor argued that applying common sense, Willis must have been in Hopkinsville, where the crime occurred. These comments by the prosecutor amount to drawing reasonable inferences based on the evidence and are within bounds.

In summary, we find that both Det. Flick and Det. Greene possessed sufficient personal knowledge to testify as they did and that their testimony was helpful to the jury's understanding of this case. Given the overwhelming evidence of Willis's guilt, certainly no palpable error resulted.

18

**B. The trial court did not err in permitting impeachment of the Commonwealth's witness, Jeremy Yates.**

Willis contends that Yates's testimony was improper impeachment evidence. Willis objected on grounds of lack of foundation, lack of inconsistency, and lack of knowledge. The trial court overruled his objection. On appeal, we review the trial court's evidentiary ruling for an abuse of discretion. *Lopez v. Commonwealth*, 459 S.W.3d 867, 873 (Ky. 2015). An abuse of discretion occurs if the trial court's decision was "arbitrary, unreasonable, unfair, or unsupported by sound legal principle." *Id.*

Under KRE 611(a), a trial court has "reasonable control over the mode and order of interrogating witnesses and presenting evidence[.]" Generally, out-of-court statements are inadmissible under the hearsay exclusion rule in KRE 802, but prior inconsistent statements may be used under KRE 801A(a)(1) "if the declarant testifies, is questioned about it, and the foundation laid as required by KRE 613." As Kentucky allows impeachment evidence for purposes of casting doubt on the witness, and as substantive evidence, strict compliance in laying the proper foundation for impeachment is required. *See Noel v. Commonwealth*, 76 S.W.3d 923 (Ky. 2002); *Jett v. Commonwealth*, 436 S.W.2d 788 (Ky. 1969).

To admit prior inconsistent statements for either purpose, a foundation must be laid pursuant to KRE 613, which provides:

> Before other evidence can be offered of the witness having made at another time a different statement, he must be inquired of concerning it, with the circumstances of time, place, and persons present, as correctly as the examining party can present them; and, if it be in writing, it must be shown to the witness, with

19

opportunity to explain it.

Here, the Commonwealth satisfied KRE 613's foundational requirements. The record reflects that as part of obtaining a favorable plea deal, Yates's attorney visited Yates in prison and asked him certain questions that had been prepared by the Commonwealth about what happened on the night in question. Yates's attorney recorded Yates's answers, which were then conveyed to the Commonwealth. Yates's responses identified those involved in the crime (him, Willis, Carter, Zivotin, Ochs, and Wilson) and specifically incriminated Willis, going so far as to say he was in charge, provided the guns, and threatened after the crime that he would hurt them if they told anyone what happened.

During Yates's first day of testimony, he stated that he did not recall any event on January 23, 2019. He then said that only he was involved in a robbery or burglary in Hopkinsville, that he beat up Stewart, but was unable to recall if Stewart was shot. When the Commonwealth asked him if he met with his attorney while in jail and answered questions provided by the Commonwealth, Yates said he had met with his attorney twice, but was unable to recall answering any questions. Yates said he had just been shown questions and answers that day, ten minutes before testifying.

When asked by the Commonwealth who was involved in the robbery, Yates testified that he did not recall anyone else being involved in the robbery, besides himself. He asserted that he was not afraid of anybody. When asked about his sudden memory loss, Yates stated that he had a disability. The

20

Commonwealth asked him what disability, and Yates said he did not know. When asked if he had a gun during the crime, Yates said no, and was unable to recall if anyone else did.

The next morning in chambers, counsel for Willis, counsel for Yates, the prosecutor and the trial judge discussed Yates's testimony. The consensus was that the attorney-client privilege between Yates and his attorney had been waived by the dissemination of Yates's answers to the Commonwealth. Regarding the Commonwealth's intent to impeach Yates with his prior answers, Willis's attorney objected, arguing that the statements were not exactly inconsistent since Yates's testimony did not contradict his prior statements; he simply said he could not recall. As to one answer Yates had provided in his written responses that "Willis was armed at all times," Willis's counsel objected as to Yates's knowledge of that information. In response, the Commonwealth agreed to redact that response and not mention it.

The trial court ruled that Yates's prior responses to the prepared questions were admissible to impeach him as a prior inconsistent statement and if Yates remained unable to recall his prior statements, then the Commonwealth could put Yates's attorney on the stand and ask him to read Yates's responses. The trial court reviewed the process for impeaching Yates: ask him a question, and if given an inconsistent answer, then ask if he remembered making the prior statement under the circumstances in which it was made. *See* KRE 613(a)(1) (the first foundational requirement is that the declarant "must be inquired of [the statement], with the circumstances of time,

21

place, and persons present[]"). Yates's attorney did not object to this process, but did indicate that he believed Yates had a low I.Q.

The Commonwealth recalled Yates and he testified that he remembered meeting with his attorney and answering questions his attorney asked. He stated that his attorney had reviewed those questions and answers with him just before he took the stand a second time. The Commonwealth told Yates that it was going to ask him those same questions that his attorney had asked and which he had answered. When the Commonwealth began questioning Yates about the events of January 23, and what time people started showing up at his house, Yates said he was unable to recall. The Commonwealth then handed Yates a written copy of the questions and responses and proceeded to go through a series of numbered questions, and when Yates said he did not recall, the prosecutor asked Yates to read his response from the document. Yates's responses identified the participants in the crime, including Willis; identified Willis and Zivotin as having guns; said that the robbery was mostly Willis's idea; Willis was in charge and had provided the guns; Yates ran out of the house once he heard gunshots; and Willis later threatened Yates and Carter that he would hurt them if they told anyone and to convey that threat to Maddie and Tia too. Throughout this exchange with the Commonwealth, Yates was hostile and labeled a number of prior responses as "lies." On cross-examination, Willis's counsel insinuated that Yates was telling the truth now since he had sworn on a Bible, and that he only gave the prior responses to obtain a favorable plea deal. On re-direct, the Commonwealth clarified that

22

Yates had provided the responses, and that no one had answered for him. Yates's attorney was never called to testify.

We conclude that KRE 613's foundational requirements for introduction of a prior inconsistent statement were satisfied. The Commonwealth outlined the time, place, and persons present for the conversation between Yates and his attorney.[4] That conversation was transcribed by Yates's attorney's office and transmitted to the Commonwealth as part of an attempt to negotiate a favorable plea deal. As the trial court observed in chambers, Yates indisputably made these prior statements. Willis argues that when Yates was presented with a copy of this transcript during his testimony, the Commonwealth failed to have him authenticate it. However, the Commonwealth established that the document contained questions and answers between Yates and his attorney, made while Yates was in jail, and Yates admitted to having reviewed that document just before testifying. On the second day of his testimony, after Yates was unable to recall his prior answer to a question, the Commonwealth asked Yates if he had a copy of his responses to the questions asked by his attorney, and Yates said no. The Commonwealth then handed him a copy of the document and asked him to read his responses. At no point did Yates assert that the document was not authentic or inaccurate. Rather, Yates recognized his answers well enough to repeatedly refer to his prior responses as "lies."

---

[4] During the conversation in chambers, counsel agreed that the date of the conversation in jail between Yates and his attorney was January 20, 2020.

23

With respect to whether Yates's "memory loss" amounts to a prior inconsistent statement, "the relevant inquiry in determining whether a lack of memory is (or should be treated as) a prior inconsistent statement, is whether, within the context of the case, there is an appearance of hostility of the witness which is the driving force behind the witness's claim that he is unable to remember the statement." *Wiley v. Commonwealth*, 348 S.W.3d 570, 578 (Ky. 2010).

Willis argues that Yates was cooperative on the first day of testifying and only became hostile on the second day because of a hostility created by the Commonwealth. This assertion is refuted by the record. Yates was hostile and uncooperative both days and repeatedly sought to frustrate the prosecution's search for the truth. The Commonwealth handled his resistance appropriately. We further note that Yates blamed his "forgetfulness" on an alleged, unidentified disability and also on his alleged intoxication at the time of the crime, neither of which was corroborated by any evidence. Moreover, during his first day of testimony, Yates claimed he was unable to read well, but during the second day read from the transcript just fine. This evidence demonstrates the extent of Yates's evasive behavior and his overall lack of candor to the court. Under these circumstances, we hold that Yates's impeachment was properly handled and the court exercised reasonable control over the mode and order of the interrogation.

## C. The Commonwealth's closing arguments were not erroneous.

Willis argues that on numerous occasions during the Commonwealth's closing arguments, the Commonwealth made "flagrantly impermissible statements" by commenting on facts not of record, which denied him a fair trial. Defense counsel objected only once during the Commonwealth's closing arguments – to the prosecutor's statement that Zivotin shot Stewart. The trial court overruled that objection. Aside from the trial court's overruling of that objection, which we will review for an abuse of discretion, our review of Willis's other allegations of prosecutorial misconduct is for palpable error only under RCr 10.26.

"Closing arguments are not evidence, and prosecutors are given wide latitude during closing arguments." *Brown v. Commonwealth*, 553 S.W.3d 826, 837–38 (Ky. 2018) (internal quotations and citation omitted). Reversal is warranted

> only if the misconduct is "flagrant", or if each of the following three conditions is satisfied: (1) proof of defendant's guilt is not overwhelming; (2) defense counsel objected; and (3) the trial court failed to cure the error with a sufficient admonishment to the jury. We use the *Dickerson* test to determine if the prosecutor's comments were "flagrant": "(1) whether the remarks tended to mislead the jury or to prejudice the accused; (2) whether they were isolated or extensive; (3) whether they were deliberately or accidentally placed before the jury; and (4) the strength of the evidence against the accused.

*Id.* (internal footnotes and citations omitted).

We first address Willis's preserved objection to the prosecutor's statement that Zivotin shot Stewart. Willis contends that insufficient facts of record support that statement. However, Officer Chris Bond who responded to

the scene testified that he followed a blood trail in the house, from the front door to the back room, where he found a male shot in the leg and another male on the floor. Ochs and Wilson testified that Willis kicked down the door to the back room, had a gun, and Wilson further testified that Willis hit Thomas with a pistol. Ochs testified that Yates was beating up Stewart in the hallway. Yates testified that he was not in the house when shots were fired. This evidence provided a sufficient basis for the Commonwealth to infer that Zivotin shot Stewart and Willis shot Thomas. *See Bills v. Commonwealth*, 851 S.W.2d 466, 473 (Ky. 1993) (in closing remarks, "the prosecutor may draw all reasonable inferences from the evidence and announce his own theory to explain the evidence and why it supports the guilt of the defendant[]"). Thus, the trial court correctly overruled Willis's objection.

Regarding Willis's unpreserved objections, Willis argues that the prosecutor's statement about how the witnesses feared him were counter to the evidence presented since no witnesses were asked if they feared Willis or if they were aware of an alleged threat Willis made. The record shows that the Commonwealth asked Yates if he feared anyone (to which he aggressively responded "no"), and yet his prior statements to his attorney reflect that Willis had threatened to hurt Yates and Carter if they told anyone about what happened and directed them to convey that threat to Ochs and Wilson. Yates's denial of being afraid of anyone is a statement for the jury to weigh in terms of credibility, alongside his prior inconsistent statement that Willis had threatened him. Moreover, we note that Wilson was visibly frightened when

26

testifying and was hesitant to identify Willis in court. The prosecutor commented on this during closing, saying, "you could see it, the witnesses were scared to death to talk about this." Based on the evidence, the Commonwealth's comment was permissible.

Willis also argues that the prosecutor impermissibly theorized that the purpose of "Ceno's" January 24 call to Yates was to reinforce Willis's threat to retaliate against Yates if he told anyone what happened. We disagree. The Commonwealth's remark was a permissible inference from the facts that advances its theory of the case. The Commonwealth did not introduce new facts during closing; it simply drew a reasonable inference from the facts of record. Given the wide latitude granted to counsel during closing remarks, we do not find the prosecutor's remarks flagrantly offensive.

Willis further claims that the Commonwealth improperly asserted that Willis telling police about a conversation he had with Carter and Yates about "hitting a lick" was "ironic" considering neither Carter nor Yates mentioned "hitting a lick." Willis argues this comment was inappropriate since the Commonwealth did not ask Yates or Cater about "hitting a lick." However, throughout the trial, the crime was referred to by both the Commonwealth and defense counsel as a plan to "hit a lick." The Commonwealth's comment about it during closing was a passing remark and did not result in manifest injustice, especially given all the evidence presented against Willis.

Lastly, Willis argues that during closing arguments, the Commonwealth improperly mentioned the plea deals and felon status of witnesses. We note

27

that Willis's counsel mentioned the co-defendants' guilty pleas several times during trial, so this topic was not newly introduced by the Commonwealth during closing. In fact, during opening and closing statements, defense counsel suggested that the co-defendants had all received favorable plea deals in exchange for their testimony against Willis. Defense counsel also mentioned Yates's plea deal during his cross-examination of him. Though Zivotin refused to testify, Carter and Yates did, in their prison jumpsuits, and both stated their current place of residence was a correctional facility. And Carter, Yates, Ochs, and Wilson all admitted their involvement in the crime. Thus, the prosecutor's comments about the co-defendants' criminal status were based on the evidence presented.

Moreover, the prosecutor's statement during closing that the codefendants were convicted felons was in response to defense counsel's assertion that the witnesses' plea deals were contingent upon them testifying against Willis. The prosecutor clarified that no plea deal was contingent upon anyone testifying against Willis and if that were the case, Zivotin would have been compelled to testify. The prosecutor observed that the defense wanted the jury to think that these witnesses got great plea deals to roll over and testify against Willis, but that simply was not true. Given these circumstances, we find the prosecutor's remarks to be appropriate.

Contrary to cases in which this Court has found the prosecutor's remarks designed to influence and inflame the jury, and disparage the defendant's character, the Commonwealth in this case remained within the

28

permissible boundaries of closing arguments. The Commonwealth's statements sought to connect the pieces of the puzzle together from the evidence by drawing reasonable inferences in support of its theory of the case. These statements certainly do not rise to the egregious – bordering unethical – level that Willis claims.

## D. The jury instructions contain no unanimity error.

Willis argues that his verdicts for first-degree burglary and second-degree unlawful transaction with a minor were not unanimous. As this issue is unpreserved, absent a finding that manifest injustice resulted, no palpable error will be deemed to have occurred. *See Sexton v. Commonwealth*, 647 S.W.3d 227, 232 (Ky. 2022) (holding that "reversal is not the universal, essential result of a unanimous verdict error. Where manifest injustice will not result, this Court can find no palpable error[]").

Section 7 of the Kentucky Constitution guarantees criminal defendants the right to unanimous jury verdicts. Because alleged unanimity violations are questions of law, our review is de novo. *Id.* at 231. Willis argues that because multiple incidents fit the definition of the jury instructions for burglary and unlawful transaction with a minor, even though only one count of each was charged, his right to a unanimous verdict was violated. This Court has held "a general jury verdict based on an instruction including two or more separate instances of a criminal offense, whether explicitly stated in the instruction or based on the proof—violates the requirement of a unanimous verdict." *Kelly v. Commonwealth*, 554 S.W.3d 854, 864 (Ky. 2018) (citations omitted).

29

As to the burglary charge, Willis contends that the Commonwealth asserted that he entered the victim's home twice, but the burglary instruction provided no way to specify which home entry each juror based their decision upon. The burglary jury instruction read as follows:

> You will find the Defendant, Shakkory Willis, guilty of First-Degree Burglary under this instruction, if, and only if, you believe from the evidence beyond a reasonable doubt all of the following:
>
> A. That in Christian County on or about January 23, 2019 and before the finding of the Indictment herein, he entered or remained in the dwelling occupied by Coryvan Thomas without the permission of Coryvan Thomas; AND
> B. That in doing so, he knew he did not have such permission;
> C. That when he did so with the intention of committing a crime therein; AND
> D. That when he entered the dwelling or while in the dwelling or in immediate flight therefrom, he was armed with a handgun that was a deadly weapon under instruction 5.

Willis alleges a "combination jury instruction" type of unanimity-verdict error. This Court has held that a "combination instruction permitting a conviction of the same offense under either of multiple alternative theories does not deprive a defendant of his right to a unanimous verdict, so long as there is evidence to support a conviction under either theory." *Brown v. Commonwealth*, 553 S.W.3d 826, 839 (Ky. 2018). *See also Capstraw v. Commonwealth*, 641 S.W.3d 148, 158 (Ky. 2022) (reiterating that a combination instruction does not deprive a defendant of his right to a unanimous verdict, "as long as the evidence was sufficient to support a combination instruction[]"). "[J]urors may reach a unanimous verdict even though they may not all agree upon the means or method by which a defendant has committed the criminal act." *King v. Commonwealth*, 554

30

S.W.3d 343, 352 (Ky. 2018). Juror unanimity in this context "means that jurors must agree upon the specific instances of criminal behavior committed by the defendant but they need not agree upon his means or method of committing the act or causing the prohibited result." *Id.*

"[W]hether a unanimous verdict violation stems from a combination jury instruction first depends on whether a particular kind of fact constitutes a factual element[ ] ... listed in the statute that defines the crime[]"). *Brown*, 553 S.W.3d at 840 (internal quotations omitted). KRS[5] 511.020(1) defines first-degree burglary as follows:

> (1) A person is guilty of burglary in the first degree when, with the intent to commit a crime, he or she knowingly enters or remains unlawfully in a building, and when in effecting entry or while in the building or in the immediate flight therefrom, he or she or another participant in the crime:
>
> (a) Is armed with explosives or a deadly weapon;
> (b) Causes physical injury to any person who is not a participant in the crime; or
> (c) Uses or threatens the use of a dangerous instrument against any person who is not a participant in the crime.

The Commonwealth argues that based on the foregoing, no element of the statute requires that the jury determine the fact of which entry into the dwelling was unlawful. Rather, the factual element a jury must agree on is that the defendant enters or remains unlawfully in the dwelling.

First, we must note that the record is unconvincing that the Commonwealth even advanced a two-entry theory. Willis points to Yates's

---

[5] Kentucky Revised Statutes.

testimony, in which he read from his prior statement, "went inside Shakkory ran out an open door, said in car before second enter Shakkory said if door locked he was going to kick it in. Went back in house." Our review of the record shows that Yates's testimony on this topic is borderline incomprehensible. Willis concedes that no other witness mentioned an earlier entry by anyone other than Ochs and Wilson. But he also points to the Commonwealth statement during closing: "Burglary, they went in, came back out, went in a second time. This time with force." However, the Commonwealth's statement was fleeting, and taken in context, the second entry was mentioned only to emphasize that they were determined to exercise force to get what they were after.

The proof showed one incident on January 23, 2019, in which Willis entered Thomas's dwelling unlawfully as part of the group scheme to rob him. In accordance with the evidence, the jury was presented with one count of burglary. KRS 511.020 does not require the jurors to agree on which of the two contemporaneous entries during that incident proved that element of the offense. No unanimity violation resulted from this instruction.

Next, Willis argues that the jury faced a unanimous-verdict issue under the instruction for unlawful transaction with a minor, which stated:

> You will find the Defendant, Shakkory Willis, guilty of Second-Degree Unlawful Transaction With a Minor under this instruction, if, and only if, you believe from the evidence beyond a reasonable doubt all of the following:

> A. That in Christian County on or about January 23, 2019 and before the finding of the Indictment herein, he knowingly induced, assisted, or caused Tia Ochs, Madison Wilson or Korey Zivotin to

32

engage in robbing Coryvan Thomas and/or burglarizing the residence of Coryvan Thomas; AND

B. That Tia Ochs, Madison Wilson or Korey Zivotin was less than 18 years of age; AND

C. That the Defendant knew Tia Ochs, Madison Wilson or Korey Zivotin was less than 18 years of age.

Willis asserts that this instruction not only provides multiple theories, but it also provides multiple victims, making it impossible to determine if the jury based its verdict on his (1) inducing, assisting, or causing, (2) robbing or burglarizing, (3) by either Ochs, Wilson, or Zivotin, (4) that Ochs, Wilson, or Zivotin were underage, and (5) whether he knew they were underage. Willis further maintains this instructional error was compounded by the absence of direct proof establishing Zivotin's age, or that Willis knew any of the three were underage.

In response, the Commonwealth asserts this fact-parsing does not matter: the outcome – regardless of the pairing of scenarios – could still be agreed upon by the jury. That is, under this "combination instruction" the jury was presented with one charge of unlawful transaction with a minor and was to determine if one of the minors listed was involved in the robbery, burglary, or both and if so, which minor, and whether Willis knew he/she was underage. The Commonwealth emphasizes that the jury had no problem agreeing on this for if they did not, they would have been hung as they were on the murder charge.

KRS 530.065(1) states, in relevant part:

(1) A person is guilty of unlawful transaction with a minor in the second degree when he knowingly induces, assists, or causes a minor to engage in illegal controlled substances activity involving

33

marijuana, illegal gambling activity, or any other criminal activity constituting a felony.

The factual element to focus on is whether the defendant had a minor engage in a felony. Willis was charged with only one count of unlawful transaction with a minor; any dispute as to the specific minor and felony is a disagreement about means, not as to whether it happened.

Regarding Willis's assertion that no direct proof established Zivotin's age, we agree. However, under the instruction, the jury could have convicted based on a determination that Willis engaged either Ochs or Madison in a felony. Testimony was elicited at trial from both Ochs and Madison that they were underage at the time of the January 23 incident. During Det. Greene's testimony, the Commonwealth asked him if Willis had acknowledged that Ochs and Madison were juveniles at the time of the crime. Det. Greene said he was not sure if Willis had used the word "juvenile", but he had said they were young girls. The Commonwealth then asked, "could he have used the word 'underage'"? Det. Greene responded, "probably so." This evidence is sufficient to support the jury's finding that one or both of the girls were minors at the time of the felony. *See, e.g., Conrad v. Commonwealth*, 534 S.W.3d 779, 784 (Ky. 2017) (no unanimity violation in combination jury instructions in which jury could have concluded defendant was a persistent felony offender first-degree based on any two or all of the prior convictions given in the instruction). Because one of the three's designations as a minor who Willis engaged in committing a felony was supported under any theory in the instruction, we do

34

not believe Willis was denied a unanimous verdict.  He did not suffer palpable error.

**E. No cumulative error resulted.**

Finally, Willis asks this Court to reverse for cumulative error.  This argument must fail, however, since no error occurred.

Cumulative error is "the doctrine under which multiple errors, although harmless individually, may be deemed reversible if their cumulative effect is to render the trial fundamentally unfair." *Mason v. Commonwealth*, 559 S.W.3d 337, 344 (Ky. 2018) (citation omitted).  When "none of the errors individually raised any real questions of prejudice, we have declined to hold that the absence of prejudice plus the absence of prejudice somehow adds up to prejudice." *Id.* at 345 (citations omitted).  Since we have found no errors in this case, the doctrine of cumulative error is inapplicable.

## III.    Conclusion

For the above reasons, the judgment of the Christian Circuit Court is affirmed.

All sitting.  All concur.

COUNSEL FOR APPELLANT:

Sarah D. Dailey
Assistant Public Advocate


COUNSEL FOR APPELLEE:

Daniel J. Cameron
Attorney General of Kentucky

Rachel A. Wright
Assistant Attorney General